[Civil No. 2695. Filed January 28, 1928.]

[263 Pac. 589.]

W. C. LeFEBVRE, State Engineer of the State of Arizona, Plaintiff, v. J. C. CALLAGHAN, as Treasurer of the State of Arizona, Defendant.

Messrs. Struckmeyer, Jennings & Strouss, for Plaintiff.

Messrs. Mathews & Bilby, for Defendant.

LOCKWOOD, J.—W. C. LeFebvre, state engineer of the state of Arizona, filed in this court an original petition for a writ of *mandamus* directed to J. C. Callaghan, as treasurer of the state of Arizona, praying that the latter be ordered to pay to the plaintiff the amount of a certain state warrant issued to the J. D. Halstead Lumber Company, and for valuable consideration transferred to plaintiff.

The petition set up the enactment by the legislature of chapter 35, Session Laws of 1922, and particularly section 10 thereof, which reads as follows:

"All balances, which may be available in the general fund, after distributing the credits therein for

the purposes and in the manner provided by law, shall be for use as creditors to an emergency fund for state purposes, to the amount which may be necessary to meet contingencies and emergencies as defined in this section. In the event of invasions, riots or insurrections, epidemics of disease, acts of God which result in invasion, damage or disaster to the works, buildings or property of the state, or, which menace the health, lives or property of any considerable number of persons in any community of the state, and confined to contingencies as to which no other funds are appropriated, or in the event appropriations have been made for similar contingencies, then, confined to amounts which may be necessary in addition to such appropriation, to meet the emergency in each case, the Governor of the state may authorize the incurring of liabilities and expenses to be paid from the emergency fund created in this section.

"Warrants shall be issued by the state auditor to the amount of such liabilities and expenses, upon claims duly itemized and sworn to by the particular officer administering them, approved as to the purposes and amounts by the Governor of the state, on the state treasurer, who shall pay the same, from the general fund, when the emergency fund as provided in this act is sufficient for that purpose; or in the event of any contingency or emergency, as provided in this chapter, the Governor may authorize the incurring of debts against the state, to the amount necessitated thereby, in excess of the amount of the emergency fund, herein provided for, provided that the aggregate amount of the debt of the state so incurred by authority of the Governor and the then existing debts of the state, direct or contingent, whether contracted by virtue of one or more laws, or at different periods of time, shall not exceed the sum of three hundred fifty thousand dollars ($350,000.00)."

It then alleged as follows:

"That heretofore, to wit, on the 12th day of July, 1927, the Honorable GEORGE W. P. HUNT, pursuant to the provisions of said chapter 35, section 10, Session Laws of Arizona, 1922, issued his proclamation wherein the said Governor declared an emergency to exist by reason of the fact that certain specified

works, buildings or property of the state had been damaged or destroyed *by acts of God, to wit, rain,* creating a contingency and emergency for which no other funds had been appropriated, and did, by such proclamation, authorize the state engineer to incur debts and liabilities to the amount of one hundred twenty-one thousand six hundred ($121,600.00) dollars for the purpose of repairing and restoring said works, buildings, and property." (Italics ours.)

The complaint then set up that, in pursuance of said proclamation, the state engineer purchased certain material from the Halstead Lumber Company for the purpose of repairing the Wickenburg bridge, mentioned in the proclamation, and that a warrant was duly presented to the state engineer for said material, approved by him and by the state auditor, and presented to the treasurer for payment. The warrant reads as follows:

"Ana Frohmiller, Auditor.
"L. C. Stephenson, Deputy Auditor.
"Department of the State Auditor, Phoenix, Arizona.
"July 23d, 1927. No. 1446.
"Pay to the order of J. D. Halstead Lumber Company $1.45 [State of Arizona] $1 and 45 cts. Account of repairs to Wickenburg bridge—Supplies, July 22d, 1927. (293) Governor Proclamation July, 1927. From the general fund and this shall be your warrant.
"To the State Treasurer of Arizona, Phoenix, Arizona.
"Ana Frohmiller, State Auditor.
"L. C. Stephenson, Deputy State Auditor.
"[Countersigned:]
"GEO. W. P. HUNT,
"Governor."
Indorsed on back thereof:
"Pay to W. C. Le Febvre, State Engineer.
"J. D. HALSTEAD LUMBER CO.,
"J. D. HALSTEAD."

The petition then alleges as follows:

"That the emergency fund created by chapter 35, § 10, Session Laws 1922, was and is sufficient for

the purposes of said proclamation and appropriation. That the aggregate amount of debts of the state of Arizona incurred by the authority of said proclamation, and the then existing debts of the state, direct or contingent, whether contracted by virtue of one or more laws or at different periods of time, do not exceed the sum of three hundred fifty thousand ($350,000.00) dollars.''

—and also that ''there is, and was at all times, sufficient money in the fund against which this claim is chargeable to pay the whole thereof.''

The petition then states that the treasurer refuses to pay the warrant, and concludes with the usual prayer for relief. To this petition respondent filed a demurrer, which was duly argued, and the matter submitted to us on such demurrer.

On consulting section 10 of chapter 35, *supra,* it appears that the Governor is authorized under certain circumstances to incur certain liabilities and expenses payable from a fund created by said section, and known as the ''emergency fund,'' or under certain other circumstances he may authorize the incurring of debts against the state in excess of said emergency fund. The circumstances which authorize the incurring of any such liability in the first place are ''invasions, riots or insurrections, epidemics of disease, acts of God which result in invasion, damage or disaster to the works, buildings or property of the state, or, which menace the health, lives or property of any considerable number of persons in any community of the state. . . . ''

It will be seen on examining the petition as aforesaid that it is based upon ''acts of God which result in . . . damage or disaster to the works, buildings or property of the state,'' and the particular act of God relied on is specified in the pleading as ''rain.''

The first question for our consideration then is, Does ''rain,'' not further described, constitute an

"act of God" within the meaning of section 10, *supra?* The phrase "act of God" has been before the courts repeatedly, and the cases wherein that phrase has been defined are almost innumerable. On examining them, it will be seen that generally speaking there are two definitions used, in accordance with the particular circumstances of the case. The one definition is:

"An act of nature which implies entire exclusion of human agency."

The other is:

"That kind of force of the elements which human ability could not have foreseen or prevented, such as lightning, tornado, sudden squall or wind, and the like."

We are of the opinion that the particular definition implied by the section in question is the latter; that is to say, some injury occasioned exclusively by nature *such as could not have been prevented by ordinary human care, skill, and foresight.* The particular thing set up in this case as being an act of God, to wit, "rain," has been discussed by the courts frequently, and almost invariably it has been held that ordinary rain, such as might be reasonably anticipated from the general climatic conditions of the neighborhood affected, is not an act of God within the legal meaning of the term, but that extraordinary storms and tempests such as could not have reasonably been foreseen are within it. *Gleeson* v. *Virginia Midland Ry. Co.,* 140 U. S. 435, 35 L. Ed. 458, 11 Sup. Ct. Rep. 859; *Sloss-Sheffield S. & I. Co.* v. *Mitchell,* 167 Ala. 226, 52 South. 69; *Willson* v. *Boise City,* 20 Idaho 133, 36 L. R. A. (N. S.) 1158, 117 Pac. 115; *Gulf Red Cedar Co.* v. *Walker,* 132 Ala. 553, 31 South. 374; *Kansas City* v. *King,* 65 Kan. 64, 68 Pac. 1093; *O. & M. R. Co.* v. *Ramey,* 139 Ill. 9, 32 Am. St. Rep. 176,

28 N. E. 1087; *Gulf, C. & S. F. Ry. Co.* v. *Boyce,* 39 Tex. Civ. App. 195, 87 S. W. 395.

The petition merely alleges that it was "rain" which caused the damage. It does not intimate whether this rain was one of the ordinary character which can be reasonably expected to occur at frequent intervals by any person acquainted with the climate of Arizona, or even annually, or whether it was a torrential downpour of such a nature that no reasonable man could have anticipated it. We think that, to bring himself within the terms of the statute, it was necessary that the petition should allege sufficient facts to show that the rain was of the character described by us above as constituting an act of God, and not merely the ordinary and expected downpour which occurs from time to time in our state. It is urged by the petitioner that we should consider the proclamation of the Governor, which is set up in full in the petition, in aid of the allegations of the latter. Even if this be true, we cannot see where the proclamation aids the petition. Nowhere therein, and particularly in regard to the bridge for which the materials involved in the present proceeding were purchased, is it alleged or even suggested that the rains which caused the damage were anything greater than, or different from, the ordinary seasonal ones which occur annually or even oftener within this state. Taking the language of the proclamation in its most liberal sense, we gather therefrom only that the bridge damaged was "washed out," presumably by flood water. It is a fact well known to all inhabitants of this state, and of which this court can well take judicial notice, that our rivers and streams are peculiarly of a torrential nature; that high water and floods occur annually on almost each and every one thereof; and that structures not prepared and planned in view of these well-known conditions are almost certain to be destroyed or badly injured within a

twelvemonth. We think, therefore, the petition, even aided by the Governor's proclamation, failed to state an "act of God" within the meaning of the statute.

Were this the only defect, it might perhaps be amended, but there is another affirmative allegation which is fatal. The particular portion of the proclamation referring to the structure for which materials were furnished in the present case reads as follows:

"Whereas, the Wickenburg bridge across the Hassayampa river and its approaches in the vicinity of Wickenburg, Maricopa county, Arizona, were washed out on two occasions last year, temporary repairs were made, but a portion of the bridge and its approach again washed out on December 5th, 1926, affecting the travel over United States Highway System No. 89. . . . "

It appears therefrom that the first damage to the bridge occurred some time before the winter of 1926, and the final damage on December 5th, 1926. The proclamation of the Governor was made on the twelfth day of July, 1927. Between the time of the last damage and the date of issuance of the proclamation the legislature of the state of Arizona held its biennial regular session.

Under our system of government, all power to appropriate money for public purposes or to incur any indebtedness therefor, unless given by the Constitution to some other body politic, or individual, rests in the legislature. The executive branch has no such right, in the absence of either constitutional or statutory provisions authorizing it, and, when such powers are given, either by the Constitution or by act of the legislature, they are confined to the particular case so authorized, while the power of the legislature on such a subject, in the absence of constitutional prohibition, is plenary. This, of course, is elemental. The chief executive of the state acted in this instance

under the authority set up in section 10 of chapter 35, *supra,* whatever that authority may be. The fund created by that section is denominated an "emergency fund." The authorization to draw on it is confined to an "emergency." What is an "emergency"? The word has been defined many times, and the generally accepted definition is:

"An unforeseen occurrence or combination of circumstances which calls for immediate action or remedy." Webster's New International Dictionary (1925 ed.), *United States* v. *Southern Pac. Co.* (C. C. A.), 209 Fed. 562; *Mallon* v. *Board,* 144 Mo. App. 104, 128 S. W. 764; *Colfax Co.* v. *Butler Co.,* 83 Neb. 803, 120 N. W. 444.

The particular occurrences set out in section 10, *supra,* all fall within the definition of being (a) unexpected, and (b) requiring immediate action.

It is apparent to us the intent of the legislature was that the Governor may incur liabilities and expenses only in cases when the contingency set forth in the section is unexpected and requires immediate action *which the usual authority, to wit, the legislature, is unable to take.* In other words, if, after the particular situation for which the liabilities were to be incurred arose, and before the Governor acted, the legislature of the state, which would, of course, have full power to meet the situation by proper appropriation, were to meet in regular session, there would no longer be any necessity for him to act, and consequently no emergency of the kind contemplated by section 10, *supra,* since the legislature, the ordinary source of funds for such purposes, would be able to provide the money immediately. We hold, therefore, that the power of the Governor to act under section 10, *supra,* as to any particular "act of God," ceases when, after such occurrence and before his action, the legislature meets either in regular session or in a special session authorized to act on the subject.

It appearing from the Governor's proclamation that the emergency authorizing him to act had passed, so far as the particular matter set up in the petition is concerned, if as a matter of fact it was ever within the statute, the demurrer to the petition is sustained, and the alternative writ quashed.

ROSS, C. J., and McALISTER, J., concur.