Richard W. WELDEN et al., Appellants,

v.

Robert D. RAY, Governor of the State of Iowa, et al., Appellees.

No. 2–57321.

Supreme Court of Iowa.

May 12, 1975.

Rehearing Denied June 16, 1975.

Barker, Hansen & McNeal, Iowa Falls, for appellants.

Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, for appellees.

UHLENHOPP, Justice.

This appeal involves vetoes of qualifications which the legislature imposed upon appropriations.

In Senate File 540, the Sixty-Fifth General Assembly of Iowa appropriated funds to the Iowa Commission on Alcoholism. Section 2, with the vetoed language lined out, provides:

There is appropriated from the general fund of the state for the biennium beginning July 1, 1973 and ending June 30, 1975, for the Iowa commission on alcoholism, the following amounts, or so much thereof as may be necessary, to be used in the manner designated: . . .

For purposes of carrying out the provisions of section one hundred twenty-three A point eight (123A.8) and chapter one hundred twenty-three B (123B) of the Code relating to the treatment of alcoholism, subject to the approval of the governor, ~~the following amount not more than fifteen percent of which may be allocated to any one local alcoholism unit or facility~~:

| [1973–1974] | [1974–1975] |
|---|---|
| $500,000 | $500,000 |

In House File 739, the General Assembly appropriated funds to the department of social services for its family and children services division. Section 1, with the vetoed language lined out, provides:

There is appropriated from the general fund of the state for the biennium beginning July 1, 1973 and ending June 30, 1975 for the department of social services institutions and for the establishment of community-based pilot programs authorized by this Act the following amounts, or so much thereof as may be necessary to be used in the manner designated:

| | 1973–74 Fiscal Year | 1974–75 Fiscal Year |
|---|---|---|
| FAMILY AND CHILDREN SERVICES: | | |
| For the operation of the following institutions· | | |
| State Juvenile Home, Toledo | $1,310,525 | $1,353,845 |
| Boys Training School, Eldora | $2,350,074 | $2,428,609 |
| Girls Training School, Mitchellville | $ 832,145 | $ 859,443 |
| Annie Wittenmyer Home, Davenport | $1,638,900 | $ – 0 – |
| Community-based pilot programs | $ 100,000 | $ – 0 – |

~~It is the intent of the general assembly in making appropriations pursuant to this area of family and children services that the moneys available for this area be used to pay salaries and other employee expenses for not more than three hundred and seventy-three permanent full-time persons employed during each fiscal year of the sixty-fifth fiscal biennium and that no more than four hundred and six permanent full-time employee positions be created or authorized during any one of such years. A variance of one percent in excess of the above filled positions is considered to be reasonable. However, the figures on the above filled positions do not apply to the appropriations for the operation of the Annie Wittenmyer Home and the establishment of community-based pilot programs authorized under this Act~~.

And § 2, with the vetoed language lined out, provides:

~~The budget of total expenditures for each institution under the department of social services during the biennium shall not exceed the state appropriation for each institution set forth in this Act except that the~~ maintenance recovery shall be available to the institutions.

In House File 769, the General Assembly appropriated funds for capital improvements of institutions in the department of social services. Section 1 of the act, with the vetoed language lined out, provides:

There is appropriated from the general fund of the state to the department of social services for the biennium commencing July 1, 1973 and ending June 30, 1975, the sum of three million (3,000,000) dollars, or so much thereof as is necessary, to be used to supplement any prior appropriations for capital improvement items for repairs, improvements, replacements, or alterations, or for any capital expenditures the department of social services may deem necessary, except as otherwise

provided in this Act, for the proper and necessary function of any institution under its jurisdiction. ~~Funds appropriated by this section shall not be used to supplement the construction of new buildings.~~

In House File 780, the General Assembly appropriated funds to the office for planning and programming and the office for economic opportunity. Section 1, with the vetoed language lined out, provides in part:

There is appropriated from the general fund of the state for each fiscal year of the biennium beginning July 1, 1973 and ending June 30, 1975, to the office for planning and programming the following amounts, or so much thereof as may be necessary, to be used for the following purposes: . . .

3. For salaries, support, maintenance, and miscellaneous purposes ~~for not to exceed seventy-two permanent full-time positions~~, excluding the state building code, funded by state or federal funds for the following: the general office, including support of community action local aid programs including state matching funds; for the community affairs division, excluding the state building code; comprehensive health planning and developmental disabilities; for the manpower administration department of labor cooperative area manpower planning system secretariat and alcoholism project:

| [1973–1974] | [1974–1975] |
|---|---|
| $435,753 | $437,856 |

4. For salaries, support, maintenance, and miscellaneous purposes for the state building code~~; however, in no event, shall this include more than three additional employees~~:

| [1973–1974] | [1974–1975] |
|---|---|
| $120,310 | $124,810 |

And § 4, with the vetoed language lined out, provides:

All federal grants to and the federal receipts of the agency receiving funds under this Act are appropriated for the purpose set forth in the federal grants or receipts.

~~If any federal financial grant to any program funded under this Act is discontinued, all state matching grants or participation by state employees in such program shall also be discontinued. Any remaining state matching funds for such program shall revert to the fund from which it was appropriated.~~

In House File 802, the General Assembly appropriated funds to the department of social services and its subdivisions. Section 1, with the vetoed language lined out, provides in part:

There is appropriated from the general fund of the state for the biennium beginning July 1, 1973 and ending June 30, 1975 to the department of social services, the following amounts, or so much thereof as may be necessary, to be used in the manner designated: . . .

1. AREA SERVICE AND ADMINISTRATION

For the administration of area offices and for county services including salaries and support ~~for a total of not to exceed one thousand six hundred sixty-five authorized full-time positions of which not more than one thousand five hundred sixty are to be filled at any one time~~:

| [1973–1974] | [1974–1975] |
|---|---|
| $5,510,700 | $5,723,100 |

2. GENERAL ADMINISTRATION AND DEPARTMENTAL OPERATIONS

For the administration of the office of the commission of social services including the council of social services, the office of the deputy commissioner, the office of the bureau of family and children services, the office of the bureau of adult corrections services, the office of the bureau of medical services, the office of the bureau of mental health services, the office of the bureau of mental retardation

services, the office of planning and budgeting, the office of administrative services, the office of personnel and staff development, the office of public information, the office of architectural and engineering services, the departmental dietary training school at Woodward, the operation of the central warehouse at Woodward, and all divisions thereof:

For salaries, support, maintenance and miscellaneous purposes ~~for a total of not to exceed five hundred twenty-four authorized full-time positions of which not more than four hundred eighty-one are to be filled at one time~~:

|  |  |
|---|---|
| [1973–1974] | [1974–1975] |
| $3,213,300 | $3,456,800 |

And § 2, with the vetoed language lined out, provides:

~~A variance of one percent above the number of filled positions specified in subsections one (1) and two (2) of section one (1) of this Act is considered to be reasonable.~~

Plaintiffs commenced this action claiming that the vetoes we have set out do not come within the purview of the 1968 item-veto amendment to the Iowa Constitution. That amendment states:

The Governor may approve appropriation bills in whole or in part, and may disapprove any item of an appropriation bill; and the part approved shall become a law. Any item of an appropriation bill disapproved by the Governor shall be returned, with his objections, to the house in which it originated, or shall be deposited by him in the office of the Secretary of State in the case of an appropriation bill submitted to the Governor for his approval during the last three days of a session of the General Assembly, and the procedure in each case shall be the same as provided for other bills. Any such item of an appropriation bill may be enacted into law notwithstanding the Governor's objections, in the same manner as provided for other bills.

The trial court upheld the vetoes, and plaintiffs appealed.

The appeal presents four principal questions: whether the power to appropriate is essentially legislative in character, whether the power to veto includes the power not only to nullify but also to alter, whether the separate-and-severable doctrine applies in this situation, and whether the Brady rule controls here. We consider that plaintiffs have standing to sue, under our decision in State ex rel. Turner v. Iowa State Highway Commission, 186 N.W.2d 141 (Iowa).

■■ I. *Appropriating as a Legislative Function.* The appropriation of money is essentially a legislative function under our scheme of government. The classic statement of the doctrine followed throughout the country was made in a Mississippi decision, Colbert v. State, 86 Miss. 769, 775, 39 So. 65, 66:

Under all constitutional governments recognizing three distinct and independent magistracies, the control of the purse strings of government is a legislative function. Indeed, it is the supreme legislative prerogative, indispensable to the independence and integrity of the Legislature, and not to be surrendered or abridged, save by the Constitution itself, without disturbing the balance of the system and endangering the liberties of the people. The right of the Legislature to control the public treasury, to determine the sources from which the public revenues shall be derived and the objects upon which they shall be expended, to dictate the time, the manner, and the means, both of their collection and disbursement, is firmly and inexpugnably established in our political system. This supreme prerogative of the Legislature, called in question by Charles I., was the issue upon which Parliament went to war with the King, with the result that ultimately the absolute control of Parliament

over the public treasury was forever vindicated as a fundamental principle of the British Constitution. The American commonwealths have fallen heirs to this great principle, and the prerogative in question passes to their Legislatures without restriction or diminution, except as provided by their Constitutions, by the simple grant of the legislative power.

See Graham v. Worthington, 259 Iowa 845, 146 N.W.2d 626; LaFebvre v. Callaghan, 33 Ariz. 197, 263 P. 589; City of Bridgeport v. Agostinelli, 163 Conn. 537, 316 A.2d 371; Opinion of the Justices, 308 Mass. 601, 32 N.E.2d 298; Mills v. Porter, 69 Mont. 325, 222 P. 428; State ex rel. Meyer v. State Board of Equalization & Assessment, 185 Neb. 490, 176 N.W.2d 920. Inherent in the power to appropriate is the power to specify how the money shall be spent. In re Opinion of the Justices, 249 Ala. 389, 31 So.2d 558; MacManus v. Love, 179 Colo. 218, 499 P.2d 609; In re Opinion of the Justices, 294 Mass. 616, 2 N.E.2d 789; State ex rel. Meyer v. State Board of Equalization & Assessment, supra; State ex rel. Sego v. Kirkpatrick, 86. N.M. 359, 524 P.2d 975.

All legislative appropriations are qualified to a degree; the legislature does not appropriate money without stating how the funds shall be used. Sometimes the qualification is general: "For salaries, support, maintenance and miscellaneous purposes". 65 G.A. ch. 9, § 1(1) (appropriation to department of justice). Sometimes the qualification is more specific: "to be used for aid to school districts for development and the conduct of programs, services and activities of vocational education through secondary schools". 65 G.A. ch. 10, § 1(3) (appropriation for vocational education). In either event, the qualification states how and for what purposes the money may be expended.

The qualification may be affirmative in form: "Salaries of nine legal assistants". 65 G.A. ch. 1, § 1(48) (appropriation for supreme court law clerks). Or it may be couched in the negative: "not more than

one thousand five hundred sixty [positions] are to be filled at any one time". 65 G.A. ch. 117, § 1(1) (area offices and county services of social services department). No difference in substance exists between affirmative and negative qualifications; both are restrictions upon the appropriations.

■ Each of the provisions vetoed in the acts before us was a condition or restriction, affirmative or negative, upon the purpose or use of the money appropriated. In imposing the conditions or restrictions, the legislature exercised the authority which is inherent in its power to appropriate.

■ We do not suggest that the legislature may, under the guise of a qualification upon an appropriation, violate the separation of powers by invading the Governor's authority to exercise executive functions. See State ex rel. Meyer v. State Board of Equalization & Assessment, 185 Neb. 490, 176 N.W.2d 920. Obviously, for example, the legislature could not constitutionally make an appropriation to a department conditional upon the Governor's appointing a specified individual to be head of the department. Such a provision would contravene § 1 of article III of our constitution, quite apart from the matter of a veto. We have no such provision here. The qualifications in these bills were within the legislative domain; they did not invade the Governor's powers.

II. *Nullify vs. Alter.* Involved in this case is the basic nature of "veto"—whether the concept of veto includes power to alter. If a governor may veto a legislatively-imposed qualification upon an appropriation but let the appropriation itself stand, he may alter and thus, in fact, legislate—notwithstanding that our constitution states, "The Legislative authority of this State shall be vested in a General Assembly". Iowa Const. Art. III, § 1 (Legislative Department).

The authorities hold that an attempted veto of a qualification on an appropriation is not within the scope of the item veto.

The leading case is another Mississippi decision, State ex rel. Teachers and Officers of Industrial Institute and College v. Holder, 76 Miss. 158, 23 So. 643. Section 73 of the legislative article of the Mississippi Constitution, like our item-veto amendment, permits veto of "part" of an appropriation bill. In Holder the Mississippi Supreme Court held:

> Every bill of the character in question has three essential parts: The purpose of the bill, the sum appropriated for the purpose, and the conditions upon which the appropriation shall become available. Suppose a bill to create a reformatory for juvenile offenders, or to build the capitol, containing all necessary provisions as to purpose, amount of appropriation, and conditions; may the governor approve and make law of the appropriation, and veto and defeat the purpose or the conditions or both, whereby the legislative will would be frustrated, unless the vetoed purposes or conditions were passed by a two-thirds vote of each house? This would be monstrous. The executive action alone would make that law which had never received the legislative assent. And after all, and despite pragmatic utterances of political doctrinaires, the executive, in every republican form of government, has only a qualified and destructive legislative function, and never creative legislative power. If the governor may select, dissent, and dissever, where is the limit of his right? Must it be a sentence or a clause or a word? Must it be a section, or any part of a section, that may meet with executive disapprobation? May the governor transform a conditional or a contingent appropriation into an absolute one, in disregard and defiance of the legislative will? That would be the enactment of law by executive authority without the concurrence of the legislative will, and in the face of it. The true meaning of section 73 is that an appropriation bill made up of several parts (that is, distinct appropriations), different, separable, each complete without the other, which may be taken from the bill without affecting the others, which may be separated into different parts complete in themselves, may be approved, and become law in accordance with the legislative will, while others of like character may be disapproved, and put before the legislature again, dissociated from the other appropriations. To allow a single bill, entire, inseparable, relating to one thing, containing several provisions all complementary of each other, and constituting one whole, to be picked to pieces, and some of the pieces approved, and others vetoed, is to divide the indivisible; to make of one, several; to distort and pervert legislative action, and by veto make a two-thirds vote necessary to preserve what a majority passed, allowable as to the entire bill, but inapplicable to a unit composed of divers complementary parts, the whole passed because of each. 76 Miss. at 181–182, 23 So. at 645.

The New Mexico Supreme Court stated the same view in State ex rel. Sego v. Kirkpatrick, 86 N.M. 359, 524 P.2d 975. The constitution in that jurisdiction gives the governor power to veto "part or parts, item or items" of appropriation bills. The court stated:

> The power of partial veto is the power to disapprove. This is a negative power, or a power to delete or destroy *a part or item,* and is not a positive power, or a power to alter, enlarge or increase the effect of the remaining parts or items. It is not the power to enact or create new legislation by selective deletions. . . Thus, a partial veto must be so exercised that it eliminates or destroys the whole of an item or part and *does not distort the legislative intent, and in effect create legislation inconsistent with that enacted by the Legislature, by the careful striking of words, phrases, clauses or sentences.* . . .

We have heretofore held that the Legislature has the power to affix reasonable provisions, conditions or limitations upon

appropriations and upon the expenditure of the funds appropriated. . . . The Governor may not distort, frustrate or defeat the legislative purpose by a veto of ·proper legislative conditions, restrictions, limitations or contingencies placed upon an appropriation and permit the appropriation to stand. He would thereby create new law, · and this power is vested in the Legislature and not in the Governor. 86 N.M. at 365, 524 P.2d at 981–982 (italics added).

The Arizona Supreme Court stated the principle thus, in Fairfield v. Foster, 25 Ariz. 146, 153–154, 214 P. 319, 322:

> Now it is very true, as stated in State v. Holder, 76 Miss. 158, 23 So. 643, that the executive cannot veto a condition or proviso of an appropriation, while allowing the appropriation itself to stand. That would be affirmative legislation without even the concurrence of the Legislature. Certainly if, for example, the Legislature appropriates, as it did once in Arizona, a certain sum for a girls' dormitory at the University, on condition that a like sum be raised by outside contributions, the Governor cannot so use his veto as to make void the condition, while letting the appropriation stand, for the Legislature might well have been willing to have spent a certain amount for the given purpose, if others would do likewise, but been utterly averse to the unconditional appropriation.

Other decisions so holding are Caldwell v. Meskill, 164 Conn. 299, 320 A.2d 788, 792 ("The court recognized in the *Patterson* case [Patterson v. Dempsey, 152 Conn. 431, 207 A.2d 739] that the primary evil intended to be curbed by the power of partial veto is the practice of log-rolling: Presented with a bill containing many items of appropriation, the governor may accept the essential and reject the frivolous. The governor in this context may thus control the amount of expenditure, but not the purpose. How much is spent is conceptually different from how an amount is spent."); Opinion of the Justices, 306 A.2d 720 (Del.Supr.); Fergus v. Russel, 270 Ill. 304, 110 N.E. 130; In re Opinion of the Justices, 294 Mass. 616, 2 N.E.2d 789; State ex rel. Cason v. Bond, 495 S.W.2d 385 (Mo.) (constitution allowed veto of "items or portions of items"—governor may not veto words which state the purpose of appropriation without vetoing appropriation also); Mills v. Porter, 69 Mont. 325, 331, 222 P. 428, 430 ("The veto is distinctly a negative, not a creative, power. The general rule is that the Governor may not exercise any creative legislative power whatsoever"); · Fulmore v. Lane, 104 Tex. 499, 511–512, 140 S.W. 405, 412 ("[The Governor] has no power to construct legislation. His authority is purely negative." Where he attempts to item veto "language qualifying an appropriation or directing the method of its uses, he exceeds the constitutional authority vested in him, and his objection to such paragraph, or portion of a bill, or language qualifying an appropriation, or directing the method of its use, becomes ineffective"); Commonwealth v. Dodson, 176 Va. 281, 296, 11 S.E.2d 120, 127 ("We think it plain that the veto power does not carry with it power to strike out conditions or restrictions. That would be legislation. Plainly, money devoted to one purpose can not be used for another, and it is equally plain that power to impose conditions before it can become available is legislation."). See also Fitzsimmons v. Leon, 141 F.2d 886 (1 Cir.); Wood v. State Administrative Board, 255 Mich. 220, 238 N.W. 16; Beckman, The Item Veto Power of the Executive, 31 Temple L.Q. 27.

We do not consider pronouncements in Florida, Ohio, and Wisconsin to be contrary to the doctrine of State v. Holder. See Green v. Rawls, 122 So.2d 10 (Fla.); State ex rel. Brown v. Ferguson, 32 Ohio St.2d 245, 291 N.E.2d 434; and State ex rel. Wisconsin Tel. Co. v. Henry, 218 Wis. 302, 260 N.W. 486. Green v. Rawls involved what the court considered to be an appropriation of .an item of $12,000 for the salary of the corrections director within a larger appropriation for the corrections department and

an appropriation of an item of $10,000 for the salary of the state forester within a larger appropriation for the forestry department. The court concluded that these individual items could be item-vetoed and held, essentially, that the case involved the Brady situation, of which we will say more later. The court concluded as in Brady that a legislature cannot, "by specifying the amount of an appropriation for a particular item and including it in a larger overall item, deny the chief executive the use of his veto power as to such item." 122 So.2d at 17. See also In re Advisory Opinion to the Governor, 239 So.2d 1, 9 (Fla.).

The Ohio decision of State v. Ferguson involved an appropriation to the attorney general for his department, with a provision that the secretary of state could pay his own counsel out of the attorney general's appropriation, in connection with litigation under certain federal laws. The attorney general was to be reimbursed from other state funds for the expense of such private counsel, so that the attorney general's own appropriation would remain at its full amount. The court considered this arrangement actually to be two appropriations and hence two "items" within the item-veto clause of the Ohio Constitution. Furthermore, the court held that neither of the two appropriations qualified the other, since the attorney general's appropriation would be maintained in full in any event. Hence the two appropriations were separate and the one for private counsel could be excised by item veto. The court said that "those provisions in an appropriation bill which are separate and distinct from other provisions in the same bill, insofar as the subject, purpose, or amount ·of the appropriation is concerned, are items within the meaning of Section 16, Article II of the Ohio Constitution." 32 Ohio St.2d at 252, 291 N.E.2d at 438. The case actually involves the separate and severable doctrine of which we shall also say more later.

The Wisconsin case, State v. Henry, also involved provisions of a bill which the court believed to be separate from the appropriation. The court did not consider its decision contrary to the principle of State v. Holder, but said: "In passing upon [plaintiff's] contentions, we find it unnecessary to decide in this case whether the Governor is empowered to disapprove a proviso or condition in an appropriation bill, which is inseparably connected with the appropriation, because, upon analyzing the terms of the bill in question, we have concluded, for reasons hereinafter stated, that the parts which were disapproved by the Governor were not provisos or conditions which were inseparably connected to the appropriation. If they had been, the decision in State ex rel. Teachers & Officers v. Holder, 76 Miss. 158, 23 So. 643, would afford support for the plaintiff's contention." 218 Wis. at 309–310, 260 N.W. at 490.

We have no occasion to say whether we would arrive at the same results on the facts as the courts reached in the Green, Ferguson, and Henry cases.

■ We thus hold that if the Governor desires to veto a legislatively-imposed qualification upon an appropriation, he must veto the accompanying appropriation as well. As stated in Note, 18 Drake L.Rev. 245, 248, 249, 250:

Therefore, an appropriation bill is a measure before a legislative body authorizing an expenditure of public funds and stipulating the amount, the manner in which that amount is to be expended, the purpose of the various items of expenditure and any other matters germane to the appropriation. . . . If any part could be disapproved, the residue which would become law might be something not intended by the legislature and against the will of the majority of each house. *It is obvious that the item veto power does not contemplate striking out conditions and restrictions alone as items, for that would be affirmative legislation, whereas the governor's veto power is a strictly negative power, not a creative power.*" (Italics added.)

Since each of the clauses involved in the acts before us is a qualification upon the particular appropriation, the Governor could not let the appropriation stand yet nullify the condition upon which the legislators gave their consent to the expenditure.

III. *Separate and Severable Provisions.* We would have a different case if the clauses involved here came under the rule relating to separate, severable provisions on which appropriations were not dependent for passage by the legislature. We had such a severable section in State ex rel. Turner v. Iowa State Highway Comm'n, 186 N.W.2d 141 (Iowa). The act involved there appropriated funds for the highway commission. 63 G.A. ch. 30. Section 4 of the act then provided, "No moneys appropriated by this Act shall be used for capital improvements, but may be used for overtime pay of employees involved in technical trades." Section 5 provided, "The permanent resident engineers' offices presently established by the state highway commission shall not be moved from their locations, however, the commission may establish not more than two temporary resident engineers' offices within the state as needed." The appropriation did not appear dependent upon inclusion of § 5 in the bill. We held § 5 separate and severable and subject to separate veto under the Governor's authority to veto part of an appropriation bill. But we were careful to distinguish § 4 from § 5. We stated:

> It should be noted section 5 places no prohibition against the use of any moneys appropriated by the act for the moving of permanent resident engineers' offices presently established by the defendant commission. *Had such language as used in section 4 been employed in section 5 we are impelled to the view that section 5 would have in such case been a proviso or condition upon the expenditure of the funds appropriated,* but lacking such phraseology it obviously is not." 186 N.W.2d at 150 (italics added).

We also quoted extensively from a decision to which we have previously adverted,

State ex rel. Wisconsin Tel. Co. v. Henry, 218 Wis. 302, 309, 260 N.W. 486, 490 ("the parts which were disapproved by the Governor were not provisos or conditions which were inseparably connected to the appropriation").

The clauses involved in the instant case were integral parts of the appropriations themselves, quite different from § 5 of the act involved in the Iowa State Highway Commission case.

IV. *Brady Rule.* We would also have a different case had the legislature attempted to evade the item-veto amendment by the device of a lump-sum appropriation followed by subdivisions calling for the expenditure of the lump sum in specified amounts for named purposes. See People ex rel. State Board of Agriculture v. Brady, 277 Ill. 124, 115 N.E. 204. The legislature contended in Brady that the governor could not item-veto one of the subdivisions without vetoing the lump sum, *as the subdivisions constituted qualifications upon the appropriation of the lump sum.* The Illinois Supreme Court held otherwise, however, saying to hold that the whole bill was one item would constitute a legislative evasion of the governor's authority to veto distinct items. It was in connection with this lump-sum device that the author of a Drake Law Review Note stated the Iowa court also would probably interpret "item" liberally so that the legislature could not "coerce the governor into approving a lump sum appropriation. . . ." 18 Drake L.Rev. at 250.

■ The legislative device of a lump-sum appropriation with subdivisions unconstitutionally invades the item-veto authority of a governor, just as the gubernatorial device of the veto of a qualification on an appropriation unconstitutionally invades the lawmaking authority of a legislature. But the problem of the Brady case is not presented by the appropriation acts before us. None of these acts appropriates a lump sum followed by a breakdown of that sum into

smaller amounts for specific purposes. The first of the acts contains two separate appropriations with no breakdowns (either of those two appropriations could of course have been item-vetoed). 65 G.A. ch. 111. The second and fourth each contains five separate appropriations with no breakdowns. 65 G.A. chs. 115, 113. The third one contains a single appropriation with no breakdown into smaller amounts. 65 G.A. ch. 114. The fifth contains three separate appropriations with no breakdowns. 65 G.A. ch. 117.

We have no Brady problem here.

The clauses involved in the case at bar are lawful qualifications upon the respective appropriations. They are not separate, severable provisions. The legislature did not evade the Governor's item-veto authority by the lump-sum device. The attempted vetoes by the Governor are beyond the scope of the item-veto amendment and are of no effect.

Reversed.

All Justices concur except HARRIS and REYNOLDSON, JJ., who dissent.

HARRIS, Justice (dissenting).

I dissent in the belief an affirmance is clearly demanded by our holding in State ex rel. Turner v. Iowa State Highway Commission, 186 N.W.2d 141 (Iowa 1971) (hereinafter *Highway Commission* ). And I am convinced the majority rejects the sounder view of item veto as a limited legislative function given the executive branch of state government as a developed part of an over-all scheme of checks and balances. In all respect, I submit it offends both the rule of stare decisis and the promise of better and more effective state government to seize on dictum in *Highway Commission* in order to retreat from its clear holding. Regrettably we thereby readopt a 19th century view of separation of state governmental powers which is wholly inadequate for the current needs of effective government.[1]

I. Item veto should be interpreted in the light of the obvious and simple truth that no branch of government can function in any capacity without expenditure of public funds.[2] Therefore under the better view an item veto power is given at least in part to provide for carefully limited executive participation in appropriation matters. Under the majority view the item veto is rendered quite meaningless.

It need not be so. In spite of the majority attempts to distinguish them, cases from other states recognize the logic supporting our holding in *Highway Commission.* State ex rel. Brown v. Ferguson, 32 Ohio St.2d 245, 291 N.E.2d 434 (1972); Dickson v. Saiz, 62 N.M. 227, 308 P.2d 205 (1957); Green v. Rawls, 122 So.2d 10 (Fla.1960); State ex rel. Wisconsin Tel. Co. v. Henry, 218 Wis. 302, 260 N.W. 486. In *Highway Commission* we clearly established the following principles:

1. An "item" in an appropriation measure is the same as a "part" or "parts" thereof.

2. Although it can be exercised only in appropriation bills it is not limited to matters therein which appropriate money.

3. That which is vetoed must be a complete legislative idea, conceptually if not grammatically, which is capable of standing alone as legislation. Fractionalized concepts such as the word "not" do not qualify.

4. That which remains must constitute complete and workable legislation. There must be no "scar tissue."

---

1. For discussion of ineffective state executives in the 19th century see generally Leslie Lipson, The American Governor from Figurehead to Leader (Chicago, 1939) pages 47–63; The Development of the American Constitution, Loren P. Beth (1971) pages 72–78.

2. Cf. O'Coin's Inc. v. Treasurer of the County of Worcester et al., 287 N.E.2d 608, 612 (Mass.1972). A court as a branch of government has inherent power to obtain required goods and services, even in the absence of statute.

5. While we are committed to the liberal view to preserve the purpose of the item veto amendment, the authority granted the Governor thereby is not without limit. Plaintiffs have suggested in argument examples *reductio ad absurdum* in which item veto power might be exceeded. Such examples would amount to deceit or trickery by which a governor would change an appropriation measure for personal gain or selfish interest. Such examples however are presented in the arguments and not in the facts before us.

II. Our holding in *Highway Commission* stands before centuries of constitutional principles on separation of governmental powers. The parties do not dispute these underlying principles. But it is appropriate to mention them because of their crucial bearing upon the question presented.

The Iowa Constitution, in common with the constitutions of all 50 states, generates a scheme of government modeled after the federal system. Item veto power, given to 43 of the governors in the United States in appropriation matters, is more extensive than that accorded the President under Article I, § 7 of the United States Constitution. The President must approve or disapprove an appropriation bill in its entirety. H. Black, Constitutional Law, § 67 (Third Ed. 1910); Muyskens, Item Veto Amendment to the Iowa Constitution, 18 Drake L.Rev. 245. However the concept of executive veto, as envisioned in the Iowa Constitution, was borrowed from the federal plan. For that reason we can look to the development of the somewhat more limited presidential veto power in order to more fully understand plaintiffs' challenge.

The delegates to the federal constitutional convention perceived executive veto of legislation as a part of a system of checks and balances. The idea was borrowed from the constitutions of the states under the Articles of Confederation. The Federalist Number 73 (Hamilton). Our system of checks and balances is, in turn, an adjunct of the concept of separation of powers. It is the cornerstone and genius of our form of government: "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." The Federalist, Number 47 (Madison). The concept was perhaps first envisioned by Montesquieu and was claimed to exist under the English Constitution. Blackstone's Commentaries Bk. I, chapter 2, § 2. The result is commonly thought to be " * * * a form of government more peculiarly adapted to the nature of the human animal than anything devised before or since." Forrest McDonald, E Pluribus Unum—The Formation of the American Republic 1776–1790 (1965).

The separation of powers concept permeates all ideas and rules which relate to the American system of government. It is directly and expressly inscribed in the Iowa Constitution:

"The powers of the government of Iowa shall be divided into three separate departments—the Legislative, the Executive, and the Judicial: and no person charged with the exercise of powers properly belonging to one of these departments shall exercise any function appertaining to either of the others, except in cases hereinafter expressly directed or permitted." Art. III, § 1.

Second in importance only to the concept which separates the powers of government among three co-equal branches of government is a corollary which ultimately should control the disposition of this appeal. Of practical necessity the three branches, by a system of checks and balances, should "be so far connected and blended as to give each a constitutional control over the others * * *." The Federalist, Number 48 (Madison). Executive veto proceeds from this practical necessity.

Another fundamental truth bears on the submission. Enshrined in the Declaration of Independence is the belief all just governmental power is derived "from the con-

sent of the governed." This belief was even then considered to be of ancient origin. Sabine & Thorson, A History of Political Theory (Fourth Ed. 1973), page 201. The principle had been previously stated:

"The powers of kings and magistrates is nothing else, but what is only derivative, transferred and committed to them in trust from the people, to the common good of them all, in whom the power yet remains fundamentally, and cannot be taken from them without a violation of their natural birthright." Works of John Milton, Volume V, page 10.

Authority for an item veto is undergirded by these principles. A healthy tension between, and obvious need for accommodation among, the three branches of government results from the powers separately conferred upon them. Such powers do not in fact belong to any branch, either under the federal system or in any state system modeled after it. This suit should not be considered a struggle for personal power. It is important to remember the powers exercised by any branch of our government remain with the people.

III. It is important also to remember the item veto amendment was not worded so as to make it a second class provision of our constitution. The amendment was adopted by the people out of their desire to adjust the healthy tension between the legislative and executive branches of our state government. We can assume the people must have considered the tension to have theretofore been out of balance. No one disputes the "purse string power" of the legislature. But the power invested in any branch of government by our constitution is subject to other express provisions. Article III, § 1, Iowa Constitution. The item veto amendment is such an express provision and should not be rendered impotent on the claim its exercise infringes a right of another branch of government. The item veto provision is inscribed in the same constitution by which the people organize all three branches of government. This truth was even conceded by the Mississippi Court in Colbert v. State, 86 Miss. 769, 775, 39 So. 65, 66, quoted by the majority and which the majority characterizes as the "classic statement": " * * * without restriction or diminution *except as provided by their Constitutions,* * * *." (Emphasis added).

In his veto messages the Governor expressed the view the legislature was in fact invading the province of the executive branch by what he considered misuse of purse string power. Executive decisions in the form of administration hiring policies, for example, were the subject of certain of the challenged vetoes. The majority summarily dismisses the Governor's claim with the unsupported assertion the power is inherent in the legislature, but is limited at some line the opinion does not draw and which I cannot discern. The effect in this case is to subject internal operations of executive departments to control of another branch. The Governor's claim points up the soundness of the holding in *Highway Commission.* With limited participation by the executive branch in such matters the Governor could assert the position of the executive branch. Such assertion would of course be subject to override.

We need not and should not arrogate to ourselves any standing to pass upon the practical effectiveness of the ultimate power of the legislature to override a veto. Plaintiffs deny its effectiveness. The vote required to override executive veto is a part of our scheme of government. Its effectiveness is not for us to measure. But it is appropriate for us to observe a power exists in the legislature to override a veto, including an item veto, by a two-thirds vote. Under the 1974 amendment the power exists in the legislature to call itself into session for such a purpose. Article III, § 2, Iowa Constitution.

Ultimately all branches of government are checked by the final power in representative government. Each branch regularly answers and accounts for its doings to the people.

IV. Finally I believe the majority opinion is wrong in renouncing *Highway Commission's* definition of separability. The trial court rightly described the proper rule:

" * * * [T]he Governor's power of item veto extends at least to provisions which are separable from an appropriation bill. Clearly, separability means that the vetoed provisions and the remainder of the bill contain ideas and concepts capable of standing on their own. The idea and concept of the provision which is vetoed must be in some manner complete in itself, as must the remainder of the bill. Viewed in this light, the vetoed provisions and the remainder of the bills here in question in each case contain two separate, and therefore separable, ideas. They contain appropriations for specified purposes, and directions that funds not be used for other specified purposes."

I do not believe the Governor's authority as recognized in *Highway Commission* should be barred by specific draftsmanship in drawing the bill. Specific draftsmanship is the practice of scrambling the words which express a complete and otherwise separable legislative idea throughout an appropriation bill. In determining separability the Governor should be able to look to legislative concepts and should not be denied the exercise of an item veto because an appropriation bill gathers together words which define separate concepts. Such concepts would be subject to executive veto if unattached to an appropriation bill. To hold specific draftsmanship an effective means of blocking the power of item veto throws out of balance the powers of the separate branches of government. It was for that reason we expressly adopted a statement in *Highway Commission*. We said:

"An excellent and exhaustive treatise on the item veto amendment to the Iowa Constitution is found in Volume 18, Drake Law Review, at page 245. At page 250, the author was moved to observe,

" 'It would seem probable that should the Iowa Legislature attempt to coerce the Governor into approving a lump sum appropriation by combining purpose and amount, the court would interpret the term "item" liberally to preserve the purpose of the item veto amendment."

"The observation of the author of the Law Review article above referred to was indeed prophetic. We do adopt such an interpretation of the term 'item', and conclude that section 5 of H.F. 823 was an item subject to gubernatorial item veto." 186 N.W.2d at 152.

Our formal adoption of the liberal interpretation of the term "item" was clear enough at the time. We took the trouble to quote with approval extensively from State ex rel. Wisconsin Tel. Co. v. Henry, supra, including the following:

" ' * * * [T]here is nothing in that [constitutional] provision which warrants the inference or conclusion that the Governor's power of partial veto was not intended to be as coextensive as the Legislature's power to join and enact separable pieces of legislation in an appropriation bill. As the Legislature can do that in this state, there are reasons why the Governor should have a coextensive power of partial veto, to enable him to pass, in the exercise of his *quasi legislative function*, on each separable piece of legislation or law on its own merits. * * *.' " (Emphasis added). 186 N.W.2d at 152.

We should reject plaintiffs' suggestion the single-subject provision of our constitution renders *Henry* inapplicable. Our single-subject provision operates in such a way as to subject our Governor to much the same difficulty in veto matters as existed in Wisconsin under *Henry*. Long v. Board of Supervisors, 258 Iowa 1278, 1285–1286, 142 N.W.2d 378, 382–383. This is not to say the single-subject provision is meaningless. It is however insufficient to protect a governor in veto matters to the extent of providing a basis to distinguish our rule from Wisconsin's.

Under the majority opinion an item veto can be exercised only at sufferance of the legislature. The power to exercise it would arise only in the unlikely event an appropriation bill would be so carelessly drafted as to omit the litany which the majority holds converts a distinct legislative idea into a purpose or proviso. The check given by the people to the executive branch is thereby surrendered to the very branch the people intended to be checked.

I would affirm.

REYNOLDSON, J., joins this dissent.