608 P.2d 792

LITCHFIELD ELEMENTARY SCHOOL DISTRICT NO. 79 OF MARICOPA COUNTY By and Through its Trustees, Barbara Robey, Barbara Brainard, David Hadley, Jr., Paul Mahoney, Mary Inez McCullough; The Litchfield Classroom Teachers Association, an affiliate of the Arizona Education Association; Donald Charles Becker, Eugene Betha, Marcina Betha and Robert Treche, as representatives a plaintiff class of property owners; Billie Allison, Martin Epps, Tucker Family Investment Company, a general partner, Lloyd Tucker, and Raymond Nicholas Panzo, a representative of a plaintiff class of taxpayers; Karen Helen Becker, Kathleen Frances Panzo, Carolyn Ullman and Chester Ullman, as representatives of a plaintiff class of parents who have currently or will have minor children attending public schools in the Litchfield Park School District; The City of Goodyear, a municipal corporation; and Citizens For Responsive Government, Inc., a non profit Arizona Corporation, Plaintiffs-Petitioners-Appellants,

v.

The Honorable Bruce E. BABBITT, in his capacity as Governor of the State of Arizona and as a member of the "Selection Board"; Andrew L. Bettwy, in his capacity as State Land Commissioner and as a member of the "Selection Board"; John A. LaSota, Jr., in his capacity as Attorney General, State of Arizona and as a member of the "Selection Board"; Ray Shaffer; Richard Searles; William Woestendiek; Reverend Culver Nelson; The Honorable Alice Truman; Ellis MacDougall; John McFarland; William Reilly; and John Little, Individually and as members of the "Prison Site Selection Committee", Defendants-Respondents-Appellees.

No. 1 CA–CIV 4828.

Court of Appeals of Arizona, Division 1, Department B.

Feb. 15, 1980.

Rehearing Denied March 11, 1980.

Review Denied March 12, 1980.

216

Shimmel, Hill, Bishop & Gruender, P. C., by Daniel F. Gruender and Michael Riikola, Phoenix, for plaintiffs-petitioners-appellants.

Robert K. Corbin, Ariz. Atty. Gen., by Russell A. Kolsrud, Asst. Atty. Gen., Phoenix, for defendants-respondents-appellees.

## OPINION

OGG, Chief Judge, Division 1.

This litigation concerns the validity of the selection of the Waddell Ranch property near the Town of Litchfield Park as the site of a new 1,000 bed medium security prison for males and a smaller facility for female prisoners. The critical issue presented is whether the legislature validly delegated to the governor the authority to determine the location of the new prison facilities.

For some time prior to the convening of the Second Regular Session of the Thirty-Third Legislature in 1978, the location of a new medium security prison was the subject of widespread public interest and debate within the legislature. The State of Arizona had previously been ordered by the United States District Court to limit population at the Arizona State Prison at Florence. *Harris v. Cardwell*, No. 75–185 (D.Ariz., filed Oct. 7, 1977). The debate continued during the Second Regular Session and ultimately resulted in the enactments with which we are concerned in this appeal.

We note at the outset that our State Constitution expressly grants to the legislature the authority to provide for the establishment of penal institutions. Article 22, section 15 of the Arizona Constitution reads as follows:

§ 15. Public institutions

Section 15. Reformatory and *penal institutions*, and institutions for the benefit of the insane, blind, deaf, and mute, and such other institutions as the public may require, *shall be established* and supported by the State *in such manner as may be prescribed by law*. (emphasis added)

House Bill 2429, which became chapter 165 of the Laws of 1978, is the bill relating to "appropriations for land, buildings and improvements for the different departments of the state and for state institutions." Section 9 of the bill relates to the Department of Corrections. The relevant portion of this enactment is as follows:

*Be it enacted by the Legislature of the State of Arizona :*

Section 1. Subject to applicable laws, the sums or sources of revenue herein set forth are appropriated for the fiscal year beginning July 1, 1978, for the purposes and objects herein specified:

\*　　\*　　\*　　\*　　\*　　\*

| Subdivision 9. DEPARTMENT OF CORRECTIONS | |
|---|---|
| From the general fund, the following is appropriated: | |
| New prison—1,000 bed medium security prison | $24,140,000.00 |
| New prison—200 bed adult women's prison—Phase 1 | 5,422,000.00 |
| **Fort Grant Training Center** | |
| Water improvements | 320,000.00 |
| Sewage treatment plant improvements | 30,000.00 |
| Additions and improvements to dining hall, kitchen and dental facilities | 220,000.00 |
| Manufacturing building—Correctional Industries | 200,000.00 |
| Vocational training shops | 558,800.00 |
| Additions and improvements in conversion of residential buildings | 270,000.00 |
| **Arizona State Prison** | |
| Security control center and improvements | 358,300.00 |
| Farm grading and ditch lining—Correctional Industries | 75,000.00 |
| Hog and dairy improvements—Correctional Industries | 75,000.00 |
| Athletic yard additions and improvements | 112,000.00 |
| **Adobe Mountain School** | |
| Centralized dining facility modification | 35,000.00 |
| **Safford Conservation Center** | |
| Kitchen and dining hall facility | 310,000.00 |
| **Arizona Youth Center** | |
| Physical plant improvements | 55,700.00 |
| **Arizona Correctional Training Facility** | |
| Additions and improvements | 1,720,000.00 |
| Total appropriation—department of corrections | $33,901,800.00 |

House Bill 2206, which became chapter 163 of the Laws of 1978, contains language critical in this litigation. The bill as enacted reads in its entirety as follows:

An Act relating to state government; providing for acceptance of executive aircraft; making an appropriation to the department of health services, division of family health services, dental health bureau for the acquisition and operation of a mobile dental clinic; making an appropriation from the dental board fund to the state board of dental examiners; making an appropriation to the incorporating division of the corporation commission for an his-

torical data base cross-reference index; making an appropriation to the department of corrections for land, buildings and improvements, and providing for site selection.

*Be it enacted by the Legislature of the State of Arizona :*

Section 1. Discretion of director of public safety

Notwithstanding any other provision of law to the contrary including any limitation placed in subdivision 83 of the general appropriations bill for the fiscal year of 1978–1979, acceptance of an executive aircraft may be made prior to December 31, 1978 if the director of the department of public safety determines that the current executive aircraft is unsafe for further operation.

Sec. 2. Appropriation; purpose

There is appropriated for the fiscal year 1978–1979 to the department of health services, division of family health services, dental health bureau the sum of ninety-four thousand six hundred forty-one dollars for the purposes of acquisition and operation of a mobile dental clinic.

Sec. 3. Appropriation

In addition to the appropriation made by Laws 1977, chapter 150, section 1, subdivision 38, there is appropriated from the dental board fund to the state board of dental examiners the sum of five thousand dollars for the remainder of the fiscal year 1977–1978.

Sec. 4. Appropriation; purpose

A. The sum of sixty-eight thousand dollars is appropriated to the incorporating division of the corporation commission for the purpose of establishing an historical data base cross-reference index.

B. The appropriation made by subsection A of this section is exempt from the provisions of § 35–190, Arizona Revised Statutes, relating to lapsing of appropriations.

Sec. 5. Appropriation; purpose

From the general fund the sum of seven million four hundred seventy-nine thousand seven hundred twenty dollars is appropriated to the department of corrections for land, buildings and improvements to be available for the following purposes in the following amounts:

| | | |
|---|---|---:|
| 1. | Improvements to electrical distribution systems | $ 930,000 |
| 2. | Improvements to correct health and code deficiencies | 1,370,000 |
| 3. | Communication system improvements | 200,000 |
| 4. | Conversion of women's division to annex | 220,000 |
| 5. | New facilities architectural fees: | |
| | a. Adult female facilities | 420,000 |
| | b. 1000 bed medium security area | 1,847,000 |
| 6. | Improvements to domestic water system | 568,000 |
| 7. | Improvements to sewage disposal and treatment systems | 464,000 |
| 8. | Utility improvements | 460,000 |
| 9. | Secondary and emergency power improvements and additions | 530,000 |
| 10. | Security control center and improvements | 31,720 |
| 11. | Inmate security control and additional security improvements | 184,000 |
| 12. | Improvements to the utility, electrical systems | 255,000 |
| | TOTAL | $7,479,720 |

Sec. 6. Sites selection

*The governor shall select the sites of the new facilities prior to September 15, 1978. The funds appropriated under section 5, paragraph 5 of this act for new facilities architectural fees shall revert to the general fund on September 16, 1978 if the sites have not been selected.*

Sec. 7. Lapsing of appropriation

Except as provided in section 6 of this act, the appropriation made in section 5 of this act shall not lapse until the purpose for which the appropriation is made is accomplished or abandoned or unless the appropriation stands until June 30, 1979 without an expenditure therefrom or an encumbrance thereon. (emphasis added)

Sections 5 and 6 and portions of section 7 of the foregoing enactment were originally contained in House Bill 2419, the only material difference being that in House Bill 2419 the governor was required to choose the site

of a new prison prior to June 30, 1978. This bill, which contained no other provision, was passed by the House. The Senate Appropriations Committee voted to amend House Bill 2419 by deleting the time limitation placed upon the governor to select the site. The full Senate approved the bill as so amended. The provisions of House Bill 2419 were subsequently incorporated by a conference committee into House Bill 2206, set forth in full above, which had originated as a supplemental appropriation to the Corporation Commission. House Bill 2206 and the capital improvements general appropriation bill were approved by both houses just prior to adjournment.

Another act pertinent to this litigation is Senate Bill 1252, enacted as chapter 179 of the Laws of 1978.[1] This legislation, designated as A.R.S. §§ 31–551 and 31–552, reads as follows:

§ 31–551. Prison site selection committee; membership; compensation; chairman

A. There is established a prison site selection committee composed of seven members appointed by and serving at the pleasure of the governor. The members shall be appointed within thirty days after the effective date of this chapter.

B. Members who are not otherwise public officers or employees shall receive compensation pursuant to § 38–611.

C. The chairman of the committee shall be selected by the governor. The committee shall meet at the call of the chairman and shall adopt rules and regulations consistent with law for the conduct of its business.

§ 31–552. Powers and duties of committee

The committee shall:

1. Select all prison sites after September 15, 1978, which decision shall be final and binding upon the state department of corrections. Such sites shall be selected in accordance with recommendations from legislative studies indicating prison inmate population projections, availability of community services and population centers and site accessibility.

2. Conduct studies of present and future prison and prison facility requirements for this state and make recommendations to the state department of corrections as to the requirements.

3. Cooperate with the department of administration division of finance and the state department of corrections in such department's planning and construction of prison facilities.

Sec. 3. Expiration date

The provisions of this act shall expire from and after June 30, 1988.

Shortly after all of the foregoing enactments were approved by the governor in early June, 1978, he appointed a "Prison Site Selection Committee" to establish criteria for the location of the new prison and to recommend a site. There was no explicit statutory basis for this particular committee because the Prison Site Selection Committee established by the last quoted statutes, A.R.S. §§ 31–551 and 31–552, was to select all sites "after September 15, 1978."

The governor's non-statutory Prison Site Selection Committee met and ultimately concluded that the Waddell Ranch property in the vicinity of Litchfield Park would be the best location for the prison. It is alleged and not disputed that the committee's final determination was reached in an executive session not open to the public.

Subsequent to the decision of the governor's Site Selection Committee, the Department of Corrections filed an application to use the Waddell Ranch property for an institutional use as a corrections facility. This application was made pursuant to A.R.S. §§ 37–441 to 37–443. The governor approved such a requested use by document executed July 7, 1978. Thereafter, the Department of Corrections commenced planning and preparing for the construction of the medium security prison on the Waddell Ranch property.

1. The validity of this legislation has not been raised as an issue and is not considered in this appeal. Chapter 179 also contains legislation relating to the Medical Student Loan Fund. See the discussion on unity of subject matter, *infra*.

Appellants commenced the present litigation seeking a declaratory judgment based upon their position that the governor lacked the power to determine the location of the prison. They further contended that if the governor had the power to select the site of the prison, he wrongfully delegated that power to the Site Selection Committee, and further that the Site Selection Committee reached its determination in violation of our "open meeting" law, A.R.S. §§ 38–431.01 to 38–431.09. The appellees moved for summary judgment. The trial court ultimately granted appellees' motion, and stated that:

> The Court concludes on the basis of the undisputed facts, that at the time he did so, the governor of Arizona had authority to select a site for a prison; that he had the right to designate advisors; and that the advisors selected by him in this particular instance were not subject to the open meeting law.

Initially we note that appellees have chosen not to rely upon chapter 163 of the Laws of 1978 as the source of power for the governor to select the prison site. This enactment contains in its Section 6 the only explicit legislative grant of power to the governor to select the prison site. Appellants contend that chapter 163 is unconstitutional in two respects. First, they contend that it violates article 4, part 2, section 13 of the Arizona Constitution in that it embraces more than one subject. This provision reads as follows:

> § 13. *Subject and title of bills*
>
> Section 13. Every Act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title; but if any subject shall be embraced in an Act which shall not be expressed in the title, such Act shall be void only as to so much thereof as shall not be embraced in the title.

Secondly, they contend that if it is to be deemed an appropriation bill, it runs afoul of article 4, part 2, section 20 of our constitution in that it is not itself "the general appropriation" bill and it embraces more than one subject in violation of the second sentence of the constitutional provision, which reads:

> § 20. *Appropriation bills*
>
> Section 20. The general appropriation bill shall embrace nothing but appropriations for the different departments of the State, for State institutions, for public schools, and for interest on the public debt. All other appropriations shall be made by separate bills, each embracing but one subject.

Appellees have urged the court to avoid ruling upon the constitutional issues raised by appellants. Appellees have accordingly offered three bases apart from chapter 163 to sustain the governor's action. Initially, they argue that the governor has constitutional and inherent power to select a prison site. Secondly, they argue that A.R.S. § 41–901 and other legislation creates explicit power in the executive to select prison sites. Finally, they argue that locating the prison was implicitly an executive function because the legislature had declared a policy to provide a prison system.

## I. CONSTITUTIONAL OR INHERENT POWER

■ It is a basic tenet of our system of government that the governor, or executive, has only such powers as are conferred upon him by our constitution or by validly enacted statute. *Holmes v. Osborn*, 57 Ariz. 522, 115 P.2d 775 (1941). The lawmaking power is vested in the legislature. Ariz.Const. art. 4, pt. 1, § 1. None of the branches of government may exercise powers which are granted to another branch. Ariz.Const. art. 3. While the governor is charged with the duty of faithfully executing the laws, Ariz.Const. art. 5, § 4 and must be accorded powers reasonably commensurate with such a broad responsibility, this is not a source from which the power to make legislative decisions can be created. *See Youngstown Sheet and Tube Company v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153, 26 A.L.R.2d 1378 (1952).

■ In the present case, article 22, section 15 of the Arizona Constitution provides that "penal institutions . . . shall be

established . . . in such manner as may be prescribed by law." The term "as may be prescribed by law" means as provided by legislative enactment. *See Kreiss v. Clerk of Superior Court*, 111 Ariz. 373, 530 P.2d 365 (1975); *Collins v. Krucker*, 56 Ariz. 6, 104 P.2d 176 (1940); *State v. State Board of Land Commissioners*, 131 Mont. 65, 307 P.2d 234 (1957).

■ It has been held in California that determining the site of a public building of the kind involved here is normally a legislative function. *See Citizens Against a New Jail v. Board of Supervisors*, 63 Cal.App.3d 559, 134 Cal.Rptr. 36 (1976); *Burdick v. City of San Diego*, 29 Cal.App.2d 565, 84 P.2d 1064 (1938). Our constitutional provision, quoted above, confirms this for Arizona. We believe that site selection inheres in the idea of "establishing" an institution of this nature. We are not dealing here with new facilities contiguous to other established prison property. We believe that a new 1,000 or 1,200 bed prison in a different county and in an area remote from any other prison can only be deemed a "penal institution" which must be "established" as prescribed by the legislature.

The appellees have stated in their brief that the executive department has historically determined the location of correctional facilities. The appellants have refuted this at some length in their reply brief with specific reference to the process of determining the location of a medium security prison in Pima County in 1976. *See also* Irvine, *Arizona Prisons: 109 Years of Neglect*, 13 Ariz.B.J. 7 (1977). Appellees have not cited any support for their contention, and we are not aware of any.

We therefore reject appellees' contention that the governor has either constitutional or inherent power to select the site for a new prison.

## II. SPECIFIC STATUTORY AUTHORIZATION

■ Appellees' next argument is that A.R.S. § 41–901 grants to the governor the power to determine the location of state prisons. A.R.S. § 41–901 reads as follows:

41–901. Governor's authority

The governor shall have charge and control of the Arizona pioneers' home, the state hospital for disabled miners, the state prison and prison farm and other state institutions the management of which is not otherwise provided by law.

We cannot find in the key words "charge", "control" and "management" anything which, by reasonable implication, carries with it the power to establish *new* prisons. "Prison" in Arizona has been interpreted in the past to mean the Arizona State Prison at Florence. *State v. Amey*, 7 Ariz.App. 59, 436 P.2d 153 (1968). We do not believe that the terms of this statute can be stretched to include the power to establish a new prison at a new location.

The appellees also argue in this portion of their brief that the former Board of Directors of State Institutions had the authority to locate and build new prisons and that their authority was transferred to the governor when the Board ceased to exist. Sections 8–101 and 8–107 of the Arizona Code Annotated 1939, to which appellees refer, are set forth in the footnote.[2] The powers

---

2. 8–101. Membership of board—Institutions controlled by—Seal.—The governor, the state treasurer, and one [1] elector of the state to be appointed by the governor, shall constitute the board of directors of state institutions. Said board shall have charge and control of the state fair, the hospital for the insane, the industrial school and school for girl offenders, the home for aged and infirm Arizona pioneers, the state prison farm and prison, the capitol building and grounds, all charitable, reformatory or penal institutions established and maintained by the state, and of such other state institutions for which no management is otherwise provided by law. The board shall have an official seal and attest all official papers therewith.

8–107. Visitations by board—Other Powers. —The members of the board shall, without notice, visit each institution under its charge at least once every four [4] months, and inspect every part of the institution and all places, buildings and grounds belonging thereto or used in connection therewith. *The board shall have general charge over the erection of new buildings and over all repairs and improvements of buildings, and the improvement of grounds and other properties belonging to the institutions under its charge*, and may, in the name of the state, bring actions necessary to protect the interests of the state. (emphasis added)

of the Board were transferred to the governor by chapter 65, section 5, of the Laws of 1941.

■ We have read at length sections 8–101 through 8–115, Arizona Code Annotated 1939, and notwithstanding the clause "[t]he board shall have general charge over the erection of new buildings" in section 107, we cannot find a legislative intent therein to confer upon this board authority to establish a new prison. We think it clear that this legislation provided for the growth of existing institutions by the addition of buildings, but not the establishment of new institutions such as a prison. We believe that the delegation of such an important power as establishing new institutions would have been set forth in explicit terms. This legislation, like A.R.S. § 41–901, speaks to the maintenance and growth of existing institutions, and not to the establishment of new ones.

### III. IMPLIED STATUTORY AUTHORIZATION

■ Appellees' third contention in this regard is that since the legislature had "declared a policy to provide a prison system", the implementation of such a policy became a function for the executive department, that is, the governor and the Department of Corrections. Appellees cite A.R.S. § 41–1602, which provides as follows:

A. There shall be a state department of corrections.

B. The department shall have as its purpose the objective of encompassing the various institutions, facilities and programs *which are now or may become a part of the correctional program of the state,* and to provide the supervisory staff and administrative functions at the state level of all matters relating to the institutionalization, rehabilitation and parole functions of all adult and youth offenders. (emphasis added)

Appellees also cite A.R.S. § 41–1604(A)(2), which reads as follows:

A. The director shall:

2. *Maintain and administer all institutions and programs within the department,* including prisons, reformatories, the Fort Grant training center, the Arizona youth center, reception and diagnostic centers, conservation camps, halfway houses, *and such other facilities and programs as may be required and established for* the custody, control, correction, treatment and rehabilitation of all adult and youth offenders committed thereto. (emphasis added)

Contrary to appellees' contention, we are unable to find within this legislative framework any authorization to locate and establish a new prison. A.R.S. § 41–1602 refers to "the various institutions . . . which are now <u>or may become</u> a part of the correctional program of the state . . ." (emphasis added). A.R.S. § 41–1604(a)(2) refers to ". . . such other facilities and programs as may be required <u>and established</u> . . . ." (emphasis added). The quoted and underscored portions of the foregoing statutes indicate to us that the legislature meant to retain the power to establish new prisons.

We are fortified in our conclusion in this regard by reference to what the legislature has provided with respect to community correctional centers. In chapter 201 of the Laws of 1978, present A.R.S. § 41–1613(A)(1), the legislature provided that the Director of the Department of Corrections may "[e]stablish and operate facilities to be known as community correctional centers." (emphasis added). The legislature has also used the word "establish" in connection with prison canteens. *See* A.R.S. § 41–1604.02.

We accordingly reject each of the appellees' arguments on preexisting authority.

### IV. THE 1978 ENACTMENTS

In order to avoid a constitutional ruling on chapter 163, we have initially considered

whether the appropriations of $24,140,000 and $5,422,000 for new prison facilities in the general appropriation bill can in themselves be sufficient to authorize the governor to select a prison site. We note in this regard that the two items of appropriation for new prison facilities are the only two items in section 9 of the capital improvements of the general appropriation bill for which a name or location of institution is not set forth. Could the governor in effect "execute" the general appropriation by locating the prison?

■ The fundamental obstacle to finding such an implied authorization is that our supreme court has made it clear that the appropriations process cannot be used for legislation. *Cochise County v. Dandoy*, 116 Ariz. 53, 567 P.2d 1182 (1977); *Caldwell v. Board of Regents*, 54 Ariz. 404, 96 P.2d 401 (1939); *Carr v. Frohmiller*, 47 Ariz. 430, 56 P.2d 644 (1936); *Sellers v. Frohmiller*, 42 Ariz. 239, 24 P.2d 666 (1933).

In *State v. Angle*, 54 Ariz. 13, 91 P.2d 705 (1939), the court stated:

The general appropriations bill can contain nothing but the appropriation of money for specific purposes, and such other matters as are merely incidental and necessary to see that the money is properly expended for that purpose only.

54 Ariz. at 21, 91 P.2d at 708. In *State v. Carter*, 167 Okl. 32, 27 P.2d 617 (1933), the court rejected the proposition that a provision could be included in a general appropriations bill which would confer authority upon a public officer that he did not previously possess. This is in harmony with *State v. Angle*, and since our constitution provides for establishment "as prescribed by law", there can be no implication of authority from the items in the capital improvements appropriations bill.

This brings us to the question of the validity of chapter 163. If chapter 163, and in particular section 6 thereof, setting forth the direction that "the governor shall select the sites of the new facilities prior to September 15, 1978" is valid, there can be no question but that the legislature has provided for the establishment of a new prison

and delegated the task of site selection to the governor.

As is noted above, appellants make two charges of unconstitutionality against chapter 163. The first is that the enactment, if other than an appropriation bill, violates article 4, part 2, section 13 of the Arizona Constitution, in that it embraces more than one subject. This presents the question of whether the various provisions of the chapter are properly and validly classifiable under the heading "[a]n Act relating to state government." The second charge is that the chapter violates the second sentence of article 4, part 2, section 20 of our constitution, in that it is an appropriations bill, other than the general appropriations bill, and includes more than one appropriation.

■ No task in the adjudication of civil controversies is more grave than passing upon the constitutionality of legislation. The legislature possesses plenary power to make the laws, subject only to the limitations of our state and federal constitutions. We face our task bearing in mind that there is a strong presumption supporting the constitutionality of a legislative enactment, and the party asserting its unconstitutionality bears the burden of overcoming the presumption. *Eastin v. Broomfield*, 116 Ariz. 576, 570 P.2d 744 (1977). Unconstitutionality must appear beyond a reasonable doubt. *New Times, Inc. v. Arizona Board of Regents*, 110 Ariz. 367, 519 P.2d 169 (1974).

■ Provisions requiring unity of legislative subject matter and singularity of appropriation bills, other than the general appropriation bill, are common in a number of state constitutions. The general subject has been treated in a comprehensive and thoughtful article written by Millard H. Ruud entitled *No Law Shall Embrace More Than One Subject*, 42 Minn.L.Rev. 389 (1958), a portion of which is included in the Sutherland treatise at 1A Sutherland Statutory Construction 523 (4th ed. C. Dallas Sands 1972). These provisions are basically aimed at the practice of "logrolling", or the combining of disparate minorities into a

majority through a combination of unrelated legislative goals in a single bill. It is said that such provisions are designed to prevent the evils of omnibus bills, surreptitious and "hodgepodge" legislation. *In Re Dos Cabezas Power District*, 17 Ariz.App. 414, 498 P.2d 488 (1972). Constitutional provisions of this nature should be interpreted liberally so as not to impede or embarrass the legislature in its business, but not so "foolishly liberal" as to render the constitutional requirements nugatory. *State v. Sutton*, 115 Ariz. 417, 565 P.2d 1278 (1977); *Taylor v. Frohmiller*, 52 Ariz. 211, 79 P.2d 961 (1938).

The word "subject" as used in provisions such as article 4, part 2, section 13 was comprehensively defined in the case of *Johnson v. Harrison*, 47 Minn. 575, 50 N.W. 923 (1891), as follows:

> [S]ubject . . . is to be given a broad and extended meaning, so as to allow the legislature full scope to include in one act all matters having a logical or natural connection. To constitute duplicity of subject, an act must embrace two or more dissimilar and discordant subjects that by no fair intendment can be considered as having any legitimate connection with or relation to each other. All that is necessary is that the act should embrace some one general subject: and by this is meant, merely, that all matters treated of should fall under some one general idea, be so connected with or related to each other, either logically or in popular understanding, as to be parts of, or germane to, one general subject.

50 N.W. at 924. See also 1A Sutherland Statutory Construction §§ 17.02, 17.03, 17.-04.

It is clear upon a reading of chapter 163 that it is principally, if not exclusively, concerned with appropriations. That being the case, we must look to article 4, part 2, section 20 of our constitution and determine its validity thereunder.

Sections 2, 3, 4 and 5 of the bill are directly appropriative in nature. The appropriations are made to different state agencies for widely diverse purposes. Section 1 of the bill is not directly appropriative in nature, but refers to the "general appropriations bill" for the then-current legislative session and permits the Director of the Department of Public Safety to accept certain aircraft. Section 6 of the bill, which is critical to this litigation, refers to section 5, which is an itemized appropriation to the Department of Corrections for, *inter alia*, architectural fees for the new prison facilities. Section 7 in turn refers to the preceding two sections and makes provisions with respect to the lapsing of the latter appropriation.

The state has argued that chapter 163 is a general appropriations bill and therefore validly may include more than one subject.

Notwithstanding our constitutional provision which speaks in the singular, we recognize that the legislature may enact more than one truly "general" appropriations bill for one year. In that connection, we note that in the Second Session of the Thirty-Third Legislature it appears that there were four appropriations bills of a "general" nature. Chapter 206 is the "feeder" bill, relating to operational appropriations to state departments and institutions, and for public schools. Chapter 165, set forth above, relates generally to capital improvements and appropriates $24,140,000 and $5,422,000 for the construction of new prison facilities. There is also an appropriations measure for capital expenditures by the Board of Regents, Senate Bill 1048, enacted as chapter 169 of the Laws of 1978. There is lastly a bill which we understand to be colloquially referred to as the "omnibus claims bill" which was entitled "An Act making appropriations for the relief of certain claimants, and authorizing payment of certain funds." This latter bill is House Bill 2427, enacted as chapter 199 of the Laws of 1978.

Millard Ruud in his article deals with the question of whether there may be more than one general appropriations bill and concludes as follows:

> There may be and probably should be no mechanical answer to this question. Where there is more than one major act

containing appropriations, it would seem that all of the appropriations acts should have some unity. Thus, an act making appropriations for the various institutions of higher education or for the various state hospitals and special schools comprising the state's eleemosynary institutions is properly classed as a general appropriation act. There is a unity in such an act. However, one containing appropriations for the operation of the insurance department, the barbers' licensing board, the watermelon marketing program, the district attorney's salary for the 30th district, and the interim legislative committee on atomic energy would seem not to be a general act. The mischief of combining diverse interests in a single bill seems, on the face of the bill, to exist in this measure. It does not seem to be a coordinated approach to the financial support for all of some segment of the state program; to be a general appropriation bill it would seem that it should deal with all or substantially all of some segment of state activity, such as public free schools, higher education, or the judiciary.

42 Minn.L.Rev. 431.

 Chapter 163 is a miscellany, rather than a cohesive and coordinated set of appropriation measures. We cannot perceive any realistic commonality between executive aircraft for the Department of Public Safety, a mobile dental clinic to be operated by the Dental Health Bureau, an apparently operational grant to the Board of Dental Examiners, an historical data based cross-reference index for the Incorporating Division of the Corporation Commission, and a capital appropriation to the Department of Corrections for a variety of purposes, including architectural fees for a new prison. The enactment cannot be deemed a general appropriations bill, as the State contends.

For the same reasons chapter 163 is in violation of the second sentence of article 4, part 2, section 20. The reasonable limits of single subject matter in an appropriations bill are alluded to in *Black and White Taxicab Co. v. Standard Oil Co.*, 25 Ariz. 381,

218 P. 139 (1923). In *Cottrell v. Faubus*, 233 Ark. 721, 347 S.W.2d 52 (1961), the court quoted from *State v. Sloan*, 66 Ark. 575, 53 S.W. 47 (1899), as follows:

> The unity of the subject of an appropriation is not broken by appropriating several sums for several specified [sic] objects, which are necessary or convenient or tend to the accomplishment of one general design, notwithstanding other purposes than the main design may be thereby subserved.

347 S.W.2d at 53. There is no single "general design" in the various provisions of chapter 163. Clearly, there is multiple subject matter. For analogous holdings, *see*, in addition to *Cottrell v. Faubus, Panitz v. Comptroller of the Treasury*, 247 Md. 501, 232 A.2d 891 (1967); *State v. Kelly*, 65 S.D. 345, 274 N.W. 319 (1937). *See also In Re House Bill 168*, 21 Colo. 46, 39 P. 1096 (1895).

We have considered the possibility of salvaging the non-appropriative provisions within chapter 163 even though the act is in clear violation of article 4, part 2, section 20. However, before we could salvage the substantive legislation, the act as a whole would have to meet the general unity of subject matter requirements of article 4, part 2, section 13. The basic difficulty with finding unity of subject matter pursuant to article 4, part 2, section 13 is that while the very general, umbrella title "[a]n act relating to State government" has been used, chapter 163 is very clearly in its essence an act relating to appropriations, as appellees contend. While subsection 1 and the first sentence of subsection 6, standing by themselves, do not directly grant funds, they are inextricably related to the appropriations process. The two constitutional provisions that we are considering share the common basic purpose of preventing logrolling and hodgepodge legislation. It would be anomalous and contrary to that purpose to hold that this bill could meet the standards of article 4, part 2, section 13 when its only unifying element is its concern with appropriations to state agencies and it is clearly in violation of article 4, part 2, section 20

which specifically deals with appropriations legislation.

Apart from appellees' characterization of chapter 163 as a general appropriation bill, together with their repudiation of it as a source of authority for site selection, and apart from the principles in regard to severability discussed below, we cannot perceive that the first sentence of section 6 of chapter 163 can escape the constitutional prohibitions against multi-subject legislation because it might possibly be viewed as substantive legislation while the remainder of the enacted bill may not. Article 4, part 2, section 13 of our constitution applies to "Every Act", while article 4, part 2, section 20 specifically applies to appropriations. If a provision of substantive legislation may be combined with four or five invalid appropriations when it relates to only one, the policy against logrolling and hodgepodge legislation has not been served. Also, in some sense, every act which the legislature passes is "an act relating to state government." We fail to see, in view of the clearly expressed policy against disunified legislation, how the first sentence of section 6 can somehow slip through the cracks between the two constitutional provisions and be valid.

The court in the *Panitz* case from Maryland considered a statute which increased state taxes and attempted to make various appropriations of the increased revenues. The court did not pass upon the constitutionality of the substantive legislation in the enactment because that issue was not before it. 232 A.2d at 899. In the course of decision, the court assumed, albeit arguendo, that the general single subject matter provisions in the Maryland constitution applied to appropriations measures. Under the circumstances of the *Panitz* case, we have no difficulty with the court's conclusion that the legislation as a whole met the general single subject matter requirements. It was concerned with "increased financial aid by the State to local subdivisions", and it had a comprehensive overall scheme to it that chapter 163 lacks.

This brings us to the last question of whether all of chapter 163 must fall or whether we may look to ascertain the dominant portion of the act and validate that portion to the exclusion of the other portions of the act. *See, generally,* 2 Sutherland Statutory Construction, § 44.01–44.20 (4th ed. C. Dallas Sands, 1973).

The Ruud article, referred to previously, clearly frames the issue of severability in the context of multiple subject matter. The author states:

It is very doubtful that the doctrine of severability is applicable to an act containing two or more subjects adequately expressed by its title. Where a portion of an act is unconstitutional, the doctrine of severability saves the constitutional portions and gives them effect, where to do so will carry out the legislative purpose. Unconstitutionality, generally flows from lack of legislative power. The one subject rule is not concerned with substantive legislative power.

It is aimed at log-rolling. It is assumed, without inquiring into the particular facts, that the unrelated subjects were combined in one bill in order to convert several minorities into a majority. The one-subject rule declares that this perversion of majority rule will not be tolerated. The entire act is suspect and so it must all fall. If this is the rationale for the constitutional rule—and it certainly is the principal one stated by the courts, then it is manifestly unsound to employ severability to save the provisions dealing with one of the subjects. The necessary assumption that this will carry out the legislative purpose, assented to by a majority of the legislators, cannot be made.

42 Minn.L.Rev. 398–99.

The writer correctly states that courts have generally struck down offending enactments in their entirety. *See especially Power, Inc. v. Huntley,* 39 Wash.2d 191, 235 P.2d 173, 179–181 (1951). *See also Jackson v. State,* 194 Ind. 248, 142 N.E. 423 (1924); *In Re Advisory Opinion,* 396 Mich. 123, 240 N.W.2d 193 (1976); *Simms v. Sawyers,* 85 W.Va. 245, 101 S.E. 467 (1919).

Any inquiry into dominant purpose of whether "logrolling" occurred is, in the final analysis, a factual inquiry. Such an inquiry injects the courts more deeply than they should be into the legislative process. We do not believe, in view of the clear terms of the constitutional prohibition, that courts should speculate as to what might or might not have been in terms of the political process. Since the enactment in question is infected by reason of the combination of its various elements rather than by any invalidity of one component, the otherwise salutary principle of severance and partial savings of valid portions does not apply. We are constrained to agree with and adopt the general rule that the entire act must fall.

Consequently, it is clear that the legislature did not prescribe by valid enactment for the governor to select the site of and thereby establish the new penal institution. That being the case, the appellants are entitled to such a declaratory judgment and it is unnecessary for us to consider any of the other contentions advanced by appellant.

The judgment of the trial court granting partial summary judgment to appellees is reversed, and the cause is remanded to the Maricopa County Superior Court for further proceedings consistent herewith.

WREN, V. C. J., and McFATE, J., concur.