ALASKA LEGISLATIVE COUNCIL,
Appellant/Cross–Appellee,

v.

Governor Tony KNOWLES, in his official capacity as Governor for the State of Alaska, and Mark Boyer, in his official capacity as Commissioner of Administration for the State of Alaska, Appellees/Cross–Appellants.

Nos. S–8842, S–8851.

Supreme Court of Alaska.

April 20, 2001.

Pamela Finley, Legislative Affairs Agency, Juneau, for Appellant/Cross–Appellee.

James L. Baldwin and John B. Gaguine, Assistant Attorneys General, and Bruce M. Botelho, Attorney General, Juneau, for Appellees/Cross–Appellants.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. *INTRODUCTION*

Governor Tony Knowles, invoking the governor's constitutionally granted power to veto "items" in appropriation bills, struck descriptive language from five appropriations the Alaska legislature enacted in 1997. Were the vetoes constitutionally invalid, as the superior court declared, either because the vetoed passages were not "items" or because the governor did not adequately explain his vetoes?[1] And if the vetoes were invalid, were the struck passages nonetheless invalid, as the superior court held, because they violated the constitution's requirement that appropriation bills be confined to appropriations?[2] Applying our independent judgment to these constitutional issues, we conclude that three of the five passages violated the confinement clause and that the four vetoes which have been challenged on the grounds that the struck passages were not "items" are invalid on that basis.

## II. *FACTS AND PROCEEDINGS*

Among the appropriation bills the Alaska legislature enacted in 1997 were chapters 98 and 100.[3] In July 1997 Governor Tony Knowles signed these two appropriation bills into law, but only after invoking the governor's item veto power and striking out specific parts of them.[4] Five of these vetoes, relating to three subjects, are challenged here. Appendix A contains the relevant appropriations and shows the vetoed words in strikeout form.

In October 1997 the Alaska Legislative Council sued Governor Knowles and Commissioner of Administration Mark Boyer (collectively "the governor") seeking a declaration that the vetoes were invalid. Counterclaiming, the governor asserted that the vetoed language violated the Alaska Constitution's confinement clause.[5] Both parties moved for summary judgment.

In a well-reasoned opinion, the superior court held that: (1) four of the vetoes were invalid exercises of the item veto power because the vetoed language was not an "item" (the court not reaching the "item" issue as to the fifth appropriation); (2) one veto was invalid because the governor did not sufficiently explain his objections; (3) despite the invalidity of the five vetoes, all five vetoed passages were nonetheless invalid because

1. *See* Alaska Const. art. II, § 15 ("The governor may veto bills passed by the legislature. He may, by veto, strike or reduce items in appropriation bills. He shall return any vetoed bill, with a statement of his objections, to the house of origin.").

2. *See* Alaska Const. art. II, § 13 ("Bills for appropriations shall be confined to appropriations.").

3. *See* chs. 98, 100, SLA 1997.

4. *See* Alaska Const. art. II, § 15.

5. *See* Alaska Const. art. II, § 13. The parties later agreed to treat the governor's counterclaims as defenses, to avoid the question of legislative immunity.

they violated the constitution's "confinement clause" requirement that appropriation bills be confined to appropriations; and (4) the invalid passages were severable from the remainder of their bills.[6]

Both sides appeal.[7]

## III. DISCUSSION

### A. Standard of Review

■ These appeals raise constitutional issues of law which we decide by applying our independent judgment.[8] In doing so we will adopt " 'a reasonable and practical interpretation in accordance with common sense' based upon 'the plain meaning and purpose of the provision and the intent of the framers.' "[9] Moreover, because these are questions of law, we will consider precedent, reason, and policy.[10]

### B. Mootness

■ The governor argues that the issues relating to the validity of his vetoes are moot because the fiscal year at issue is now over. But we agree with the council that we should consider these issues under the public interest exception to the mootness doctrine.[11] Appropriations are enacted every year and are often spent before any dispute can reach this court.[12] Further, the public interest is directly affected by disputes about the consti-

tutional provisions implicated here.[13] We therefore reach the merits of these appeals.

There is a second mootness issue. In Part III.C.3, we hold that the vetoed language in the three Alaska Seafood Marketing Institute (ASMI) appropriations violated the confinement clause. This holding technically moots any question about the validity of those vetoes. And our conclusions in Parts III.C.1 and III.E.1—that four of the struck passages were not "items"—also moot the dispute about the adequacy of the governor's statements of objections for those passages. But again, the public interest exception to the mootness doctrine prompts us to consider these issues.

### C. The Alaska Seafood Marketing Institute Appropriations

The legislature enacted three appropriations for ASMI.[14] Each contained identical language which made the appropriation "[c]ontingent on [ASMI] having no employees who are located outside Alaska whose positions are classified at more than Range 21 on the state salary schedule under AS 39.27.011...." [15] The governor struck this language from the three ASMI appropriations.

Although it held that the governor adequately explained his objections, the superior

6. As to other vetoes not at issue in these appeals, the superior court held that the council's challenges were moot, because the appropriated money had already been spent.

7. We commend all counsel for the quality of their briefs and oral arguments.

8. See Cook v. Botelho, 921 P.2d 1126, 1128 (Alaska 1996).

9. Id. at 1128–29 (quoting Arco Alaska, Inc. v. State, 824 P.2d 708, 710 (Alaska 1992)).

10. See Langdon v. Champion, 752 P.2d 999, 1001 (Alaska 1988).

11. See Kodiak Seafood Processors Ass'n v. State, 900 P.2d 1191, 1196 (Alaska 1995). The public interest exception requires us to consider: (1) the possibility of recurrence or repetition of the issue; (2) the danger that mootness would repeatedly circumvent review of the issue; and (3) the importance of the issue to the public interest. See id. at 1196.

12. See Thomas v. Rosen, 569 P.2d 793, 795 (Alaska 1977) ("[A] challenge to an item veto may not come within sufficient time to fully litigate the matter....").

13. Cf. Fordice v. Bryan, 651 So.2d 998, 1001 (Miss.1995) ("[P]ublic policy and the magnitude of the importance of these issues require[ ] this Court to review the Governor's actions with respect to the .... appropriations bills as such actions may continue to be repeated and forever escape review....").

14. See ch. 98, § 6, SLA 1997; ch. 100, §§ 47, 70, SLA 1997. Section 70 of chapter 100 amends section 6 of chapter 98.

15. Ch. 98, § 6, SLA 1997; ch. 100, §§ 47, 70, SLA 1997. The state salary schedule specifies twenty-six ranges, labeled five to thirty. See AS 39.27.011(a). In 1997 a Range 21 Step A employee was to be paid $4,155 monthly, subject to cost-of-living adjustments. See AS 39.27.011(a), (e), (f) (1996).

court held that the attempt to veto "the contingency language" in the ASMI appropriations was "illegal and of no effect," reasoning that "the item veto power encompasses only the power to reduce or strike sums of money." It nonetheless struck the disputed language because its inclusion violated the confinement clause.

The council argues that these vetoes are invalid, because the vetoed language was not an "item" within the meaning of the Alaska Constitution, and also because the governor failed to adequately state his objections to the vetoed language, contrary to the constitution. The governor responds that the vetoes were valid and that, in any event, the vetoed language is invalid because its inclusion in appropriation bills violated the confinement clause.

### 1. Is the vetoed language an "item"?

Article II, section 15 of the Alaska Constitution gives the governor power to exercise two different types of vetoes. Its first sentence confers the general power to veto a bill.[16] Its second sentence confers the power, "by veto, [to] strike or reduce items in appropriation bills." [17] At issue here is this power to "strike or reduce items" by exercising the item veto while approving other parts of the same bill.

The question is whether the item veto power permits the governor to strike from an appropriation bill descriptive language that does not specify the amount appropriated. The superior court held that it does not. It held that "the item veto power encompasses only the power to reduce or strike sums of money." [18] We agree.

Our analysis focuses on the meaning of "item." We have never addressed what "item" means in context of the item veto power. Our constitution does not define the term.

■ Based on the language of our constitution, the historical purposes of the item veto, and the pertinent public policy considerations, we now define "item" as "a sum of money dedicated to a particular purpose." [19]

Our analysis begins with the Alaska Constitution. It gives the legislature the power to legislate [20] and appropriate.[21] It gives the governor the power to influence the state's budget by requiring him or her to submit a proposed budget and general appropriation bill to the legislature [22] and by striking or reducing items appropriated by the legislature.[23] The governor's item veto power is thus one of limitation. The governor can delete and take away, but the constitution does not give the governor power to add to or divert for other purposes the appropriations enacted by the legislature.

This approach is consistent with our earlier discussion of the governor's budgetary power. In *Thomas v. Rosen* we noted that

16. Alaska Const. art. II, § 15 ("The governor may veto bills passed by the legislature. He may, by veto, strike or reduce items in appropriation bills. He shall return any vetoed bill, with a statement of his objections, to the house of origin.").

17. *Id.*

18. The Uniform Rules of the Alaska State Legislature state that "[a]n item in an appropriation bill includes a line item, an allocation, and an appropriation." Uniform Rules Alaska State Legislature R. 42(c) (1998). But this definition does not address what constitutes an "item" in the context of the item veto power.

19. *Cf. Bengzon v. Secretary of Justice*, 299 U.S. 410, 414–15, 57 S.Ct. 252, 81 L.Ed. 312 (1937) ("An item of an appropriation bill obviously means an item which in itself is a specific appropriation of money, not some general provision of law which happens to be put into an appropria-

tion bill."); *Inter Faculty Org. v. Carlson*, 478 N.W.2d 192, 195 (Minn.1991) (defining "item of appropriation" within context of specific statute as "a separate and identifiable sum of money appropriated from the general fund dedicated to a specific purpose"); *Commonwealth v. Dodson*, 176 Va. 281, 11 S.E.2d 120, 127 (1940) (defining an "item in an appropriation bill" as "an indivisible sum of money dedicated to a stated purpose").

20. *See* Alaska Const. art. II, § 1.

21. *See* Alaska Const. art. II, § 13. *Cf. State v. Fairbanks N. Star Borough*, 736 P.2d 1140, 1142–43 (Alaska 1987) (implicitly recognizing that appropriation power resides in legislature and cannot be delegated to executive).

22. *See* Alaska Const. art. IX, § 12.

23. *See* Alaska Const. art. II, § 15.

Alaska's constitutional convention delegates intended to "create a strong executive branch with 'a strong control on the purse strings' of the state."[24] But this control gives the governor no appropriation power. The item veto permits the governor only to tighten or close the state's purse strings, not to loosen them or to divert funds for a use the legislature did not approve. The governor's power to control the purse strings is fully realized by recognizing the governor's constitutionally defined—and limited—role in the appropriations process.

The council argues that the governor's item veto power is negative.[25] We agree. True, striking out language might be characterized as an act of positive creation to some extent; in the broadest sense a new bill results. But such characterizations are semantic. Our constitution does not give the governor the power to rewrite appropriation bills except by striking or reducing items, and if the constitutional delegates had intended to give the governor the power to add or divert, they easily could have done so.[26]

The council also argues that the item veto power is an executive exercise of legislative power, and therefore should be strictly construed. Professor Briffault reasons that such arguments fail to recognize the difference between the item veto and the traditional veto.[27] However the item veto power is characterized, we conclude that it was intended only to limit the legislature's appropriation power, not to grant the executive a quasi-legislative appropriation power permitting appropriations the legislature never enacted.[28]

The definition we adopt here also seems most consistent with the words of our constitution. First, the power expressly applies to "items in appropriation bills."[29] The word "item" conveys a notion of unity between two essential elements of an appropriation: the amount and the purpose.[30] Altering the purpose of the appropriation by striking descriptive words interferes with that unity because the result is no longer the item the legislature enacted. In comparison, striking the amount is the equivalent of a complete veto of a particular appropriation. And reducing the amount is a result the constitution expressly permits.[31]

Second, the governor may either "strike" or "reduce" an item. Reduction implies diminution. This suggests that an item reduction must have a quantitative effect, implying that reduction must affect the appropriation's amount. It seems unlikely that the constitutional drafters intended the word "item" to have two widely divergent meanings, one incorporating the essential element of amount and the other not, depending on whether a governor chooses to reduce or strike.[32] We therefore think that "item" was intended to include the element of amount.

Third, the phrase "strike or reduce" also implies a greater/lesser relationship between these two forms of exercising the item veto power. Reducing an item appears to be a lesser form of striking an item. This implies that these two forms are qualitatively

---

24. *Thomas v. Rosen*, 569 P.2d 793, 795 (Alaska 1977) (quoting 3 Proceedings of the Alaska Constitutional Convention (PACC) 1740 (Jan. 11, 1956)).

25. *See, e.g., Caldwell v. Meskill*, 164 Conn. 299, 320 A.2d 788, 791–92 (1973).

26. During discussion of the item veto, one delegate cautioned that while the governor should be allowed to veto an item in an appropriation bill, he should not be "entitled to the right to amend." 3 PACC 1758 (Jan. 11, 1956). The minutes do not imply that any delegate intended the item veto to give the governor power to affirmatively amend appropriations.

27. Richard Briffault, *The Item Veto in State Courts*, 66 Temp. L.Rev. 1171, 1185 (1993).

28. Consider, for example, the effect of striking from an appropriation's descriptive language a negative, a limiting date for expending the money, or one of several purposes.

29. Alaska Const. art. II, § 15.

30. *Cf.* AS 24.08.030 ("Bills for appropriation . . . shall include the amount involved and the purpose. . . .").

31. *See* Alaska Const. art. II, § 15.

32. *See Cenarrusa v. Andrus*, 99 Idaho 404, 582 P.2d 1082, 1090 (1978) ("Obviously the word item can not be given different meanings within the same sentence.").

similar and have equivalent effects, i.e., they diminish the amount appropriated. Reducing an item lessens its amount; striking it lessens its amount to nothing. This implies that an "item" must include a sum of money. Likewise, a passage that does not include a "sum of money dedicated to a particular purpose" is not an "item" which the governor can strike or reduce. Therefore, a veto that does not delete or reduce the amount of money appropriated is not a valid exercise of the power article II, section 15 grants.

The historical purposes of the item, or partial, veto also support our analysis. It originated as a reform measure to prevent legislators from "logrolling" when they enact appropriation bills which necessarily address many subjects and need not be confined to a single subject, and to give governors some ability to limit state expenditures.[33] These purposes seem most directed at the amount of an appropriation. Permitting a governor to strike descriptive language would not limit expenditures or help balance a budget. And, although striking language that is only descriptive might reduce logrolling, doing so would only alter purpose, not amount. For reasons discussed below, this could result in an appropriation at odds with what the legislature passed.

Finally, public policy disfavors a reading of "item" that would permit the executive branch to substantively alter the legislature's appropriation bills, effectively resulting in appropriations passed without the protections our constitution contemplates.[34]

Other states with the item veto have announced a range of judicial definitions.[35] Professor Richard Briffault considers these definitions to reflect three general approaches, which he describes as (1) favoring the legislature, (2) balancing legislative and executive prerogatives, or (3) favoring the executive.[36] The governor urges us to adopt an approach favoring the executive; the council asks us to adopt an approach favoring the legislature. The superior court adopted an approach generally favoring the legislature. As Professor Briffault recognizes, however, item veto decisions "resist easy classification," and his three-approach categorization risks "enormous oversimplification." [37] This case does not require us to adopt any of these approaches.

Many courts have defined "item" in a way that makes the amount of an appropriation an essential part of the item.[38] They reason that the item veto power is a "negative" power, limiting the governor's authority to create new legislation through the creative use of item vetoes. As one court held:

> The power of partial veto is the power to disapprove. This is a negative power, or a power to delete or destroy a part or item, and is not a positive power, or a power to alter, enlarge or increase the effect of the remaining parts or items.... Thus, a partial veto must be so exercised that it eliminates or destroys the whole of an item or part and does not distort the legislative intent, and in effect create legislation inconsistent with that enacted by the Legislature, by the careful striking of words, phrases, clauses or sentences.[39]

33. See *Bengzon*, 299 U.S. at 415, 57 S.Ct. 252; *Cenarrusa*, 582 P.2d at 1091; see also Briffault, *supra* note 27, at 1177–80; Roger H. Wells, *The Item Veto and State Budget Reform*, 18 Am. Pol. Sci. Rev. 782, 786 (1924). Professor Briffault describes "logrolling" as "the practice of adding together in a single bill provisions supported by various legislators in order to create a legislative majority." Briffault, *supra* note 27, at 1177.

34. See article II, section 14 of the Alaska Constitution, providing in part:

> No bill may become law unless it has passed three readings in each house on separate days, except that any bill may be advanced from second to third reading on the same day by concurrence of three-fourths of the house considering it. No bill may become law without

an affirmative vote of a majority of the membership of each house.

35. See Briffault, *supra* note 27, at 1184–85.

36. *See id.* at 1184–98.

37. *Id.* at 1184.

38. See, e.g., *Dodson*, 11 S.E.2d at 127 (defining an "item in an appropriation bill" as "an indivisible sum of money dedicated to a stated purpose").

39. *State ex rel. Sego v. Kirkpatrick*, 86 N.M. 359, 524 P.2d 975, 981 (1974) (citations omitted); see also *Rush v. Ray*, 362 N.W.2d 479, 482 (Iowa 1985) ("[T]he governor's power is a negative one

A few states define "item" as something less than a coupling of a sum and a purpose. An example is found in *State ex rel. Wisconsin Senate v. Thompson.*[40] The Wisconsin Supreme Court there held that "the governor may, in the exercise of his partial veto authority over appropriation bills, veto individual words, letters and digits … as long as what remains after veto is a complete, entire, and workable law."[41] No other state seems to have followed Wisconsin's lead, although the Washington Supreme Court held in *Washington State Legislature v. Lowry* that "[t]he Governor's line item veto should extend to nondollar provisos in appropriations bills."[42]

A few courts prefer to focus on the circumstances of the particular appropriation provision at issue. As in *Colorado General Assembly v. Lamm,*[43] these courts determine that whether there is an "item" subject to the item veto power is "best accomplished on a case-by-case basis."[44]

Each general approach has benefits and drawbacks. An approach more favorable to the executive would certainly advance the item veto's historic purposes. But our definition of "item"—"a sum of money dedicated to a particular purpose"—does not prevent the governor from using the item veto for those purposes. We are therefore not persuaded by Professor Briffault's suggestion that this result may erode the item veto's anti-logrolling function.[45]

Courts upholding gubernatorial item vetoes have sometimes done so by invoking

confinement clause policies in defining an "item."[46] Doing so seems problematic. First, it allows the governor to exercise the item veto not because the struck passage *is* an item of appropriation, but because it is *not,*[47] i.e., because the struck language violates the requirement that appropriation bills "be confined to appropriations."[48] Second, allowing the governor to veto language because the governor thinks it violates the confinement clause would confer on the chief executive an amendatory power Alaska's constitution does not grant. We are therefore unpersuaded by cases relying on this rationale. *Lowry,* on which the governor bases much of his argument, is among these cases.[49] An assertion that a bill violates the confinement clause should be resolved by debate squarely focusing on that issue, rather than by allowing the confinement clause to be used to enhance a gubernatorial power having different historical origins.

■ Applying the "item" definition here, we conclude that the language struck from the ASMI appropriations is not an "item." It does not appropriate a sum of money dedicated to a stated purpose. By striking this language, the governor was not vetoing by striking or reducing, but rather editing the ASMI appropriations. Upholding these vetoes would give the governor the power to spend appropriated monies without observing limitations enacted by the legislature. This would permit a de facto re-appropriation. Granting that power here would not advance the anti-logrolling and budget-balancing pur-

that does not allow him to legislate by striking qualifications in a manner which distorts legislative intent."); *Welden v. Ray,* 229 N.W.2d 706, 713 (Iowa 1975) (" 'It is obvious that the item veto power does not contemplate striking out conditions and restrictions alone as items, for that would be affirmative legislation, whereas the governor's veto power is a strictly negative power, not a creative power.' ") (quoting Note, *Item Veto Amendment to the Iowa Constitution,* 18 Drake L.Rev. 245, 249–50 (1969)).

**40.** 144 Wis.2d 429, 424 N.W.2d 385 (1988).

**41.** *Id.* at 388 (citations omitted).

**42.** 131 Wash.2d 309, 931 P.2d 885, 896 (1997).

**43.** 704 P.2d 1371 (Colo.1985).

**44.** *Id.* at 1381 (citations omitted).

**45.** *See* Briffault, *supra* note 27, at 1185.

**46.** *See Welsh v. Branstad,* 470 N.W.2d 644, 649–50 (Iowa 1991) (inquiring as to whether provision was related to neighboring appropriation); *Henry v. Edwards,* 346 So.2d 153, 158 (La.1977) (inquiring as to whether provision was general legislation more appropriately dealt with elsewhere).

**47.** *See Lowry,* 931 P.2d at 896.

**48.** Alaska Const. art. II, §.13. *See infra* Part III.C.3.

**49.** *See Lowry,* 931 P.2d at 896.

poses underlying the item veto, because these vetoes did not reduce the amount of the ASMI appropriations.

Our conclusion in Part III.C.3—that these passages cannot constitutionally be part of appropriation bills—does not alter our analysis of the "item" issue. Even if these passages did not violate the confinement clause, they would not be "items" subject to the item veto.

We therefore hold that the governor did not validly exercise the item veto power when he struck this language from the three ASMI appropriations.

> 2. *Did the governor deliver a constitutionally adequate statement of objections to the vetoed ASMI language in chapter 100?*

The governor must return "any vetoed bill, with a statement of his objections, to the house of origin." [50] We have never decided what the governor must do to satisfy the "statement of objections" requirement.

The three ASMI appropriations became parts of chapters 98 [51] and 100. [52] The veto message concerning what became chapter 98 stated: "In taking final action on the FY98 operating budget, I followed a long-standing gubernatorial tradition of vetoing intent language because it is not appropriate in an appropriations bill." [53] That message also stated:

> I also vetoed language which purported to make the appropriation for ASMI conditional on having no upper level employees located outside the state because it violates the constitutional limits placed on appropriation bills. To prevent any unnecessary

impediment to marketing efforts Outside during the current salmon crisis, fish processors, fishers, and the ASMI board urged me to veto this as a prudent exception to the general rule of having state jobs located in Alaska. [54]

The governor's veto message concerning what became the chapter 100 ASMI appropriations contained the same general "intent" objection first quoted above, but did not include a separate explanation of the sort set out in the quotation indented above. [55]

■ The council argues that although the governor adequately stated his objections to the language he struck from the ASMI appropriation in chapter 98, his objection to the identical language in the two ASMI appropriations in chapter 100 was inadequate, invalidating those vetoes. The superior court held that the legislature had adequate notice of the reasons for the governor's chapter 100 ASMI vetoes because it received both the governor's chapter 100 objection and the more complete chapter 98 objections at "literally the same minute."

The council objects to this "adequate notice" theory. It argues that the governor should be required to give the legislature specific notice of the objections to each bill to avoid constant questions about the sufficiency of notice. The council also argues that a governor might provide unclear objections for purposes of delay and making untimely any attempt to override the veto. [56] The governor asserts that the legislature's argument elevates form over substance, because the vetoes in this case were submitted at "the same minute."

The requirement that the governor explain the reasons for a veto serves at least two

---

50. Alaska Const. art. II, § 15.

51. Ch. 98, § 6, SLA 1997. Chapter 98 also contains the Community Residential Center provisions. *See* ch. 98, § 39, SLA 1997.

52. Ch. 100, §§ 47, 70, SLA 1997. Chapter 100 also contains the Valdez Treatment Center provisions. *See* ch. 100, § 74(a), SLA 1997.

53. 1997 House Journal 1993.

54. 1997 House Journal 1994.

55. *See* 1997 Senate Journal 2114.

56. The legislature must meet "immediately" and reconsider passage of a vetoed bill or item if it receives a veto message during a regular session of the legislature. *See* Alaska Const. art. II, § 16. Bills vetoed after adjournment of the first regular session of the legislature shall be reconsidered no later than the fifth day of the next regular or special session of that legislature, and bills vetoed after adjournment of the second regular session shall be reconsidered no later than the fifth day of a special session of that legislature, if one is called. *See id.*

principal functions. It allows the legislature to determine what it must do to avoid incurring another veto.[57] And it forces the governor to reveal his or her reasoning, "so that both the Legislature and the people might know whether or not he was motivated by conscientious convictions in recording his disapproval."[58]

We need not decide whether receipt of the explanation for the chapter 98 veto gave "adequate notice" of the governor's objections to chapter 100, because we hold that the governor's "intent" objection for chapter 100 was itself sufficient.

We accept for discussion's sake the council's argument that the governor's chapter 100 "intent" objection would have been clearer if it had disclosed whether the governor would also consider language which validly conditioned an appropriation to be invalid intent language.

But in our view such a detailed disclosure is not necessary. And attempting to distinguish between an objection which asserts a facially valid ground for veto, and an identical objection which arguably mischaracterizes the struck appropriation language, would create complex and case-by-case interpretive disputes. Subjecting the substantive adequacy of each objection to judicial scrutiny would be unavoidably time-consuming. Judicial involvement would be unlikely to generate bright-line distinctions that would provide guidance useful in avoiding future disputes and litigation. And ultimately such disputes are inherently political because they implicate the appropriations and budgetary powers of the legislature and the executive, and the political relationship between those branches of government. The judiciary has no special competence to settle these types of inherently political disputes. We also think the purposes underlying the statement-of-objections requirement do not demand case-by-case judicial review. The legislature, through knowledge accumulated in dealing with the governor, is capable of interpreting the sufficiency of an objection, and is thus able to decide whether to enact an amended appropriation or to seek a veto override. It is no less able than the judiciary to compare the governor's words and the struck language to decide for itself whether the governor was motivated by "conscientious convictions." And the ultimate arbiter of that question is the electorate.

■ The best way to resolve such disputes is to apply the "minimum of coherence" standard when reviewing gubernatorial objections. The Colorado Supreme Court adopted this approach in *Romer v. Colorado General Assembly,*[59] and we adopt it here for Alaska. Under this approach, courts look to see whether the objection makes comprehensible reference to the provision being vetoed, and do not attempt to evaluate the reasoning underlying the objection.[60] In the words of the Colorado Supreme Court, "[t]o disallow a veto for the complete absence of reasons is to establish an objective standard—one with which meddlesome courts cannot tamper."[61]

The governor's chapter 100 "intent" objection meets the minimum-of-coherence standard. The language struck from chapter 100 can be fairly characterized as "intent" language, and the objection clearly refers to the vetoed passages. We therefore conclude that the objection is constitutionally adequate.

### 3. Does the vetoed language in the ASMI appropriations violate the constitution's confinement clause?

We next consider the governor's argument that the legislature violated the confinement clause by including the vetoed language in the three ASMI appropriations. Our constitution provides that "[b]ills for appropriations shall be confined to appropriations."[62]

---

57. *See Arnett v. Meredith,* 275 Ky. 223, 121 S.W.2d 36, 40 (1938).

58. *Id.*

59. 840 P.2d 1081 (Colo.1992).

60. *See id.* at 1084–85.

61. *Id.* at 1085 (quoting *Jones v. Rockefeller,* 172 W.Va. 30, 303 S.E.2d 668, 683 (1983) (Neely, J., dissenting)).

62. Alaska Const. art. II, § 13; *see also* AS 24.08.030 ("Bills for appropriation shall be confined to appropriations and shall include the

We have never delineated the boundaries of this requirement.

The confinement clause prevents the legislature from enacting substantive policy outside the public eye. The process for enacting substantive bills gives meaningful opportunity for public notice and comment. Article II, section 14 of the Alaska Constitution requires three readings of a substantive bill, on three separate days, " 'to ensure that the legislature knows what it is passing' and to ensure an opportunity for the expression of public opinion and due deliberation." [63] This opportunity may be stifled if substantive provisions are attached to appropriation bills in the form of conditions. Unlike other legislation, appropriations are not subject to the single—subject requirement of article II, section 13–a requirement meant to avoid logrolling.[64] Allowing substantive enactments in an appropriation bill may also be problematic because appropriation bills are frequently a product of a free conference committee and, as such, must be voted on in their entirety and cannot be amended on the floor.[65] Consequently, as the superior court noted, the confinement clause prevents a legislator seeking to advance unpopular legislation from burying it in a popular appropriation measure. Strict enforcement of constitutional limits helps ensure that the public will be fully informed of proposed legislation.

▮ The superior court here applied a confinement clause test first articulated in 1983 by the superior court, Judge Walter L. Carpeneti presiding, in *Alaska State Legislature v. Hammond.*[66] The superior court there addressed, among other issues, claims that eleven appropriations violated the confinement clause. The superior court wrote that to satisfy the confinement clause,

> the qualifying language must be the minimum necessary to explain the Legislature's intent regarding how the money appropriated is to be spent. It must not administer the program of expenditures. It must not enact law or amend existing law. It must not extend beyond the life of the appropriation. Finally, the language must be germane, that is appropriate, to an appropriations bill.[67]

We find the authority the superior court cited in *Hammond* persuasive,[68] and we approve the five-part *Hammond* formulation as a non-exclusive test for deciding whether an appropriation violates the confinement clause. We further elaborate on this test before applying it.

The council suggests that the "minimum necessary" language is best understood simply as a requirement that "appropriation language explain how, when, or on what the money is to be spent. Therefore, this part of the test is better expressed as simply requiring the language to explain the legislature's purpose regarding the appropriation." We agree generally with the first of these propositions, but we believe that this factor is better stated in terms of what it permits rather than what it requires. This factor

amount involved and the purpose, method, manner, and other related conditions of payment.").

**63.** *State v. A.L.I.V.E. Voluntary,* 606 P.2d 769, 772 (Alaska 1980) (quoting *North Slope Borough v. Sohio Petroleum Corp.,* 585 P.2d 534, 543 n. 11 (Alaska 1978) and citing 3 PACC 1751–54 (Jan. 11, 1956)).

**64.** *See Suber v. Alaska State Bond Comm.,* 414 P.2d 546, 557 (Alaska 1966) (noting that this requirement is designed "to prevent the inclusion of incongruous and unrelated matters in the same bill in order to get support for it which the several subjects might not separately command, and to guard against inadvertence, stealth and fraud in legislation"). More specifically, the South Dakota Supreme Court has observed that South Dakota's equivalent clause is intended to allow members of the legislature to be free to vote on an appropriation bill " 'knowing that appropriations and nothing else were involved.' " *South Dakota Educ. Ass'n v. Barnett,* 582 N.W.2d 386, 391 (S.D.1998) (quoting *Sellers v. Frohmiller,* 42 Ariz. 239, 24 P.2d 666, 669 (1933)).

**65.** *See* Uniform Rules Alaska State Legislature 42(b)-(d) (1998).

**66.** No. 1JU–80–1163 CI (Alaska Super., May 25, 1983).

**67.** *Id.* at 44–45.

**68.** *See Henry v. Edwards,* 346 So.2d 153, 158 (La.1977); *State ex rel. Meyer v. State Bd. of Equalization & Assessment,* 185 Neb. 490, 176 N.W.2d 920, 926 (1970); *Biles v. Commonwealth Dep't of Pub. Welfare,* 44 Pa.Cmwlth. 274, 403 A.2d 1341, 1343 (1979); *Flanders v. Morris,* 88 Wash.2d 183, 558 P.2d 769, 772 (1977).

limits the legislature's ability to include in an appropriation bill legislation cloaked as a "description."

■ The council suggests that the *Hammond* formulation quoted above is deficient because an appropriation should be able to change existing law on the subject of appropriations. The council argues that the confinement clause is not violated when the legislature amends a prior appropriation in an appropriation act. We believe that this is an accurate statement of law. But the *Hammond* formulation would not seem to preclude this practice in any event, because the new appropriation bill would amend only a prior appropriation, not an "existing law."

The council proposes additional illumination of the prohibition on enacting or amending substantive law. The council characterizes case law from other states as generally dictating that an appropriation for a statutory program may not include provisions changing the requirements of that program, even temporarily for the purposes of that appropriation.[69] The council cites three Florida cases in support. *Chiles v. Milligan* considered appropriation language that would have taken money to be awarded under the statutory education funding formula and adjusted it according to the ratio of classroom salaries to total salaries.[70] The court struck this language as an enactment of new law.[71] In a subsequent but similarly named case, *Chiles v. Milligan,* the court struck down appropriation language that would have allowed education funds to be

used for purposes other than those specified by statute.[72] But in *Department of Education v. School Board of Collier County,* the court upheld an appropriation provision that increased funds for all schools except those with a millage value per student of more than twenty percent of the statewide average; the court reasoned that the appropriated money was in *addition to* the standard education funding and therefore did not amend existing law.[73]

We agree with the council's assertion that the differences between such cases reflect the tension between a desire to prevent legislatures from using appropriation bills to make programmatic changes (even for a year) and the realization that legislatures do not have to fund or fully fund any program (except, possibly, constitutionally mandated programs), and in fact may choose to fund programs that are subject to conditions or contingencies.

With regard to the germaneness requirement, the council's brief usefully discusses cases from other jurisdictions concerning what their confinement clauses permit and prohibit. The council lists the following conditions and contingencies that state courts have upheld as sufficiently "related" or "germane" to the money appropriated:[74] (1) limits on amounts that could be spent at an individual facility;[75] (2) limits on the number of employees for which the money could be spent;[76] (3) a prohibition against using the

---

69. *See, e.g., Moreau v. Lewis,* 648 So.2d 124, 126–28 (Fla.1995) (holding that provision in appropriation bill requiring co-payment for pharmacy expenses was invalid); *Murray v. Lewis,* 576 So.2d 264, 265–67 (Fla.1990) (declaring requirement in appropriation bill that participants in tuition waiver program exhaust other resources invalid).

70. 659 So.2d 1055, 1056–59 (Fla.1995).

71. *See id.* at 1059.

72. *See* 682 So.2d 74, 75–77 (Fla.1996).

73. *See Department of Educ. v. School Bd. of Collier County,* 394 So.2d 1010, 1011–13 (Fla.1981); *see also Biles,* 403 A.2d at 1342–43 (upholding provision stating that no part of appropriation

could be used to pay assistance to full-time college student who had not participated in federal program for dependent children); *Pannell v. Thompson,* 91 Wash.2d 591, 589 P.2d 1235, 1237, 1239–40 (1979) (upholding limit in appropriation bill on amount that could be spent on entire general relief assistance program, even though statute specified payments of certain amounts).

74. We paraphrase the council's description of these decisions, without necessarily endorsing either its description of the holding or the result in each cited case.

75. In support of this proposition the council cites *Welden v. Ray,* 229 N.W.2d 706 (Iowa 1975).

76. In support of this proposition the council cites *Welden.*

money for new construction;[77] (4) a requirement related to federal funds;[78] (5) a provision making an appropriation for driver education contingent on the enactment of a tax on drivers' licenses;[79] and (6) a requirement that funds for contracted work be spent only if a state laboratory could not perform the work.[80]

On the other hand, the council notes that courts have struck down these provisions because they were not sufficiently connected with the expenditures: (1) a requirement that the money not be spent for trade delegations unless there was nonpartisan executive council representation;[81] (2) a requirement that the inmate population at a specified facility be reduced;[82] (3) a provision conditioning a department of health appropriation on the department relinquishing federal money to a private family planning council;[83] (4) a requirement for giving notice of prisoners' escapes and transfers;[84] and (5) a prohibition against electioneering by district attorneys in a certain parish.[85]

The council characterizes the differences between these cases as follows:

> In general it appears that courts will uphold conditions that could (albeit with some effort) be written as purposes, *e.g.*, which facilities, which employee positions, which buildings or types of buildings, the money could be spent on. This would be true even if the conditions were written in the negative, *e.g.*, "money from this appropriation may not be used to fund employee contracts;" "money from this appropriation may not be used to fund new construction." *See Welden v. Ray*, 229 N.W.2d

706, 710 (Iowa 1975). It also appears that contingencies will be upheld if they relate to the receipt or nonreceipt of specific funds, *e.g.*, federal funds, matching funds, the tax intended to fund the expenditure, or relate to the occurrence or nonoccurrence of something that would make the expenditure desirable.... However, contingencies that relate to things other than the need for or use of the money or the need for the activity, seem more vulnerable to being found insufficiently "connected" to the appropriation.

We agree with the council's characterizations of the limits on the legislature's appropriation power. We do so not to predict the outcome of future disputes or to minimize the importance of the *Hammond* factors when analyzing a confinement clause dispute, but because the legislative council, speaking for the legislature, has usefully given examples of appropriation provisions which it regards as unconstitutional.

 In approaching confinement clause disputes, we assume that an act of the legislature is constitutional.[86] The burden of showing unconstitutionality is on the party challenging the enactment; doubtful cases should be resolved in favor of constitutionality.[87]

 With this background, we now apply the five *Hammond* factors to the vetoed language in the ASMI provisions.

### a. *Intent*

The vetoed language required ASMI to move upper level employees to locations in

---

**77.** In support of this proposition the council cites *Welden*.

**78.** In support of this proposition the council cites *Welden* and *State ex rel. Sego v. Kirkpatrick*, 86 N.M. 359, 524 P.2d 975 (1974).

**79.** *See In re Advisory Opinion to the Governor*, 239 So.2d 1, 10 (Fla.1970).

**80.** *See Kirkpatrick*, 524 P.2d at 982–83.

**81.** *See Welsh v. Branstad*, 470 N.W.2d 644, 647, 649–50 (Iowa 1991).

**82.** *See Brown v. Firestone*, 382 So.2d 654, 657, 669 (Fla.1980).

**83.** *See Colton v. Branstad*, 372 N.W.2d 184, 186, 191–92 (Iowa 1985).

**84.** *See Henry*, 346 So.2d at 163.

**85.** *See id.* at 159–60.

**86.** *See Baxley v. State*, 958 P.2d 422, 428 (Alaska 1998).

**87.** *See id.; Bonjour v. Bonjour*, 592 P.2d 1233, 1237 (Alaska 1979); *Litchfield Elementary Sch. Dist. No. 79 v. Babbitt*, 125 Ariz. 215, 608 P.2d 792, 800 (App.1980); *Barnett*, 582 N.W.2d at 392.

Alaska in order for ASMI to carry forward monies from appropriations in prior years. These three ASMI appropriations did not themselves appropriate monies for upper level staffing. Rather, they addressed the "marketing [of] Alaska seafood products." [88] The vetoed language therefore expressed the legislature's intent about how *other* ASMI appropriations were to be spent, not its intent about how *these* appropriations were to be used.[89]

### b. *Administering the program*

The vetoed language did not specify how these three appropriations were to be used, and instead addressed staffing funded under separate appropriations. This language effectively administered ASMI's program because it limited the executive's exercise of discretion in staffing and locating executive-branch offices whose operations were funded by separate appropriations.

Because this language did not specify how these three appropriations were to be spent, we do not need to decide here whether, as the council argues, the appropriation power gives the legislature authority to decide where executive-branch personnel will be located. Likewise, we need not decide whether, as the governor asserts, the appointment of executive officers is an executive function,[90] and whether the geographic location of particular levels of state officials is the type of "close supervision" of state government that is essentially executive in character.[91]

### c. *Germaneness*

The council argues that the vetoed language is germane to marketing seafood.

The governor argues that it is not, because employee location does not relate to ASMI's statutory duties. We conclude that the vetoed language is not sufficiently germane because these three appropriations do not fund staffing at any location affected by the struck language. These appropriations were for purchasing contractual services, expenditures unrelated to encouraging "local hire." The superior court correctly observed that separate appropriations funded state employee positions. The vetoed language therefore is not germane to these three appropriations. Given the absence of any direct relationship, it is insufficient that the language arguably has some general relationship—because it generally concerns ASMI and the performance of ASMI's duties—to the ASMI appropriations in chapters 98 and 100.

### d. *New substantive law*

The superior court found the vetoed language objectionable because it addressed an issue of substantive law, local hire, that the legislature has repeatedly addressed with substantive legislation. We agree that this language has the effect of creating a "mini-local hire law." According to the legislature's drafting manual, "an appropriation bill may not contain substantive provisions." [92] Permitting it to enact substantive policy in one appropriation bill by imposing conditions on another appropriation bill would reduce the public scrutiny and debate which accompany policy making, and could encourage log-rolling and free-riders to achieve results not politically attainable in non-appropriation bills.

---

**88.** *See* ch. 98, § 6, SLA 1997; ch. 100, § 70, SLA 1997.

**89.** *See infra* Part III.C.3.c.

**90.** *See Bradner v. Hammond,* 553 P.2d 1, 6 (Alaska 1976).

**91.** *Cf. Anderson v. Lamm,* 195 Colo. 437, 579 P.2d 620, 623–24 (1978) (finding that "the making of specific staffing and resource allocation decisions" are "powers of close supervision that are essentially executive in character").

**92.** *Manual of Legislative Drafting,* 35 (1999). That manual states:

These limitations have two basic effects on drafting. One effect is that when a requestor wants to establish a new agency or program, there usually must be two bills drafted. One bill sets up the agency or program, the other bill appropriates money for the agency or program. The effective date of the appropriation bill would be tied to the effective date of the related substantive bill.

A second effect of the limitations of art. II, sec. 13, of the state constitution, is that a drafter must avoid including "riders" on appropriation bills. Money should be appropriated for a specific purpose or program, but further limitations on the program itself must be in a separate bill unless they can be drafted as a lawful condition on the appropriation.

The council argues that the legislature could have accomplished the same result with line-item appropriations and that the legislature followed the equivalent of that process. But we think that the process followed here was not equivalent. Line-item appropriations would have been subject to item vetoes, and would have required the legislature to give individualized consideration to each ASMI budget item. The legislature did not follow that course. The vetoed language here substantively affected the use of other appropriations, and cannot be considered merely a condition attached to the chapter 98 and 100 appropriations. In reaching beyond these appropriations, the struck language created new substantive law.

### e. Life of the appropriations

These appropriations did not state whether the out-of-state staffing limitation expired with the fiscal year. And the vetoed language does not direct how these appropriations were to be spent. It was instead intended to limit other appropriations. It is therefore unclear whether the life of the staffing limitation actually extended beyond the duration of the ASMI appropriations in chapters 98 and 100.

### f. ASMI conclusion

Regardless of whether the vetoed language was to extend beyond the life of these three ASMI appropriations, it violates the other four *Hammond* factors. We therefore conclude that including the vetoed language in the chapter 98 and 100 ASMI appropriations violated the confinement clause. The superior court correctly reached the same conclusion.

### D. Community Residential Center Appropriation

The legislature appropriated funds to the Department of Corrections for "new community residential centers" (CRCs).[93] This appropriation included the following passage: "This appropriation is for new CRC beds, not

owned or controlled by municipalities, to provide space in institutions for violent felons. All beds will meet department standards for Community Residential Centers. Contracts will be competitively bid." The governor vetoed all three sentences in this passage.

### 1. Was the struck CRC language an "item"?

Having decided that the veto of this passage was invalid because the governor's veto explanation was inadequate, the superior court did not decide whether the struck passage was an "item." The council only tangentially suggests that it was not an item. The governor does not appear to address the issue on appeal.

Our discussion of the item veto in Part III.C.1, in context of the ASMI appropriations, clearly indicates that the language struck from the CRC appropriation was not an "item."

### 2. Was the governor's statement of objections adequate?

The governor's veto message for chapter 98 stated: "In taking final action on the FY98 operating budget, I followed a long-standing gubernatorial tradition of vetoing intent language because it is not appropriate in an appropriations bill."[94] Does this objection adequately explain this veto?

The superior court held that it did not. The court reasoned that the governor's general "intent" objection could not be said to cover the vetoed CRC language because the vetoed passage "clearly was not intent language," and no other explanation arguably applied.

For reasons discussed above in Part III.C.2, this is the type of interpretation that courts should avoid when considering the constitutional sufficiency of a statement of objections. The reviewing court should simply determine whether the objection makes comprehensible reference to the provision being vetoed, and should not attempt to eval-

---

93. *See* ch. 98, § 39, SLA 1997. The legislature separately appropriated funds for existing CRCs. This appeal concerns only the veto of language from the appropriation for new CRCs.

94. 1997 House Journal 1993.

uate the reasoning underlying the objection.[95]

The governor's "intent" objection meets this minimum-of-coherence standard. The struck language can permissibly be characterized as merely expressing the legislature's intent. The governor's explanation for vetoing the CRC language is therefore constitutionally adequate.

 3. *Did the language struck from the CRC appropriation violate the confinement clause?*

■ Applying the *Hammond* factors and the presumption of constitutionality discussed in Part III.C.3, we next determine whether including the struck passage violated the confinement clause.

Some of the factors seem to be in relative balance. The qualifying language in the first sentence is the "minimum necessary to explain the Legislature's intent" about how the money is to be spent. The second sentence also describes how the money is to be spent, but can be read to specify standards; the third specifies procedures and does not describe what the money is for. These two sentences can be read to administer the program or to impose substantive requirements better addressed in a substantive bill. Likewise, the first sentence is clearly germane and appropriate to an appropriation bill, the second may be, and the third is not. None of the vetoed language seems to extend beyond the life of the appropriation. Therefore, the first, second, and fifth *Hammond* factors are

in balance and the fourth favors finding no violation.

Further, the struck language does not clearly offend the third *Hammond* factor (no enactment of new law or amendment of existing law). The governor argues that because the words "not owned or controlled by municipalities"[96] prevented the department from using this appropriation to contract with municipalities to provide CRC space, they substantively changed existing law, which allowed the commissioner to contract with municipalities.[97] The council responds that AS 33.30.031(a) allows for use of public or private facilities,[98] and that a decision to fund one type of facility over the other does not enact new law. We agree with the council. Alaska Statute 33.30.031 authorizes the commissioner to contract with municipalities. But it does not *require* the commissioner to put municipalities on footing equal with private enterprise as potential providers of new CRC bed space. The appropriation therefore does not preclude the commissioner from fulfilling the department's statutory mandate. Instead, it specifies the type of CRC space the money covers.[99]

We conclude that the CRC appropriation does not violate the confinement clause.

 4. *Does the vetoed language in the CRC appropriation violate the principle of separation of powers?*

■ The Alaska Constitution provides that "[t]he executive power of the State is vested in the governor."[100] The governor argues that the vetoed language violates this

95. *See supra* Part III.C.2; *Romer*, 840 P.2d at 1084–85.

96. Ch. 98, § 39, SLA 1997.

97. Counsel for the governor asserted at oral argument that the condition here violated AS 33.30.031(a), which gives the commissioner broad power to contract with public agencies. But this statute does not specify municipalities. The governor's argument simply restates why this condition allegedly violates AS 33.30.031(a).

98. AS 33.30.031(a) provides, in pertinent part:

 The commissioner shall determine the availability of state correctional facilities suitable for the detention and confinement of persons

held under authority of state law or under agreement entered into under (e) of this section. If the commissioner determines that suitable state correctional facilities are not available, *the commissioner may enter into an agreement with a public or private agency to provide necessary facilities.* (Emphasis added.)

99. *Cf. Welden*, 229 N.W.2d at 710 (holding that conditions and restrictions on how money is to be spent are proper in appropriation bills).

100. Alaska Const. art. III, § 1. We addressed this provision in *Bradner*, 553 P.2d at 3–8, and the topic of separation of powers generally in *Public Defender Agency v. Superior Court*, 534 P.2d 947, 950–51 (Alaska 1975).

provision and thus the principle of governmental separation of powers because it eliminates the department's discretion to contract with public agencies to provide CRC space. The council argues that the policy decision to fund privately owned CRCs rather than publicly owned CRCs was a legitimate exercise of legislative power. We agree with the council. We held above that this language does not preclude the department from fulfilling its statutory mandate. Instead, this language embodies a permissible policy decision on how to spend the CRC money. It therefore does not violate the separation-of-powers principle.

### E. Valdez Therapeutic Treatment Program Appropriation

The governor vetoed language in a bill appropriating funds to the Department of Corrections for a therapeutic treatment community program in Valdez.[101] The vetoed language refers to the efficiency of the program, apparently without legal effect.[102]

#### 1. Is the vetoed language an "item"?

■ Applying the standard discussed in Part III.C.1, we first consider whether the vetoed language is an "item." The council argues that it is not, because it directed the appropriation's use. Alternatively, we think this language may be read simply to describe the program. Either way, the vetoed language is not an "item" because it does not appropriate any sum of money to a particular purpose. The veto was therefore invalid.

#### 2. Was the governor's statement of objections adequate?

The council argues that the governor's veto explanation is inadequate.[103] This appropriation was part of what became chapter 100. The question is whether the governor's

general "intent" objection adequately explained his veto, the same question discussed in Part III.D.2 in context of the CRC appropriation. Applying the minimum-of-coherence standard described there, we conclude that it did. The vetoed passage can be characterized as intent language and the governor's objection coherently refers to the vetoed provision.

#### 3. Does the vetoed language in the treatment program appropriation violate the confinement clause?

■ This bill appropriated $400,000 for an inmate program in Valdez "where cost per inmate day (exclusive of treatment costs) will not exceed the statewide average cost per inmate day for correctional institutions."[104] The governor struck the quoted language. Did including the vetoed language violate the confinement clause? The correct answer is not obvious, primarily because it is not clear what effect, if any, this language has. It is unclear whether it conditions the way the Valdez facility was to be run or simply describes the program. The former reading would violate the confinement clause; the latter would not.

Despite this ambiguity, we conclude that this language does not violate the confinement clause. Because one permissible reading of the language is constitutional, and because we think it preferable to choose the reading that avoids unconstitutionality,[105] we conclude that this language is descriptive and non-binding. We therefore hold that its inclusion did not violate the confinement clause.

#### 4. Does the vetoed language in the treatment program appropriation violate the principle of separation of powers?

■ The governor contends that the vetoed treatment program language impermis-

---

101. See ch. 100, § 74(a), SLA 1997.

102. See id.

103. We choose to reach this issue although it is technically mooted by our ruling that the vetoed language was not an "item."

104. Ch. 100, § 74(a), SLA 1997.

105. See Bonjour v. Bonjour, 592 P.2d 1233, 1237 (Alaska 1979) (stating that validly enacted statutes enjoy presumption of constitutional validity); Hoffman v. State, 404 P.2d 644, 646 (Alaska 1965) (stating that if statute may be reasonably construed to avoid unconstitutionality, court must do so); cf. Parker v. State, 667 P.2d 1272, 1274 (Alaska App.1983) (noting that ambiguous statutes should be interpreted to avoid conflict with constitution).

sibly interferes with the administration's discretion in managing the program and therefore violates article III, section 1 of the Alaska Constitution and the separation-of-powers principle. The council counters that there is "little point" to this language, but that it is a legitimate attempt to minimize costs.

We concluded above that this language did not violate the confinement clause because it could be read as a description of the program. The same reasoning applies here. Because this language can permissibly be read not to direct the executive branch to take any action, it does not interfere with executive discretion. We therefore conclude that this language does not violate the principle of separation of powers.

### F. *Other Issues*

■ The council contends that if an appropriation is unconstitutional because it violates the confinement clause, the violative language is not severable. Accepting that contention would inevitably require us to invalidate an entire appropriation item if we found it contained language violating the confinement clause. If we were to routinely invalidate an entire appropriation whenever a part violates the confinement clause, we would chill potentially meritorious lawsuits seeking to litigate confinement clause issues. We decline to create such a disincentive. We conclude that after the offending language is removed from the ASMI appropriations, the remaining language is independent and complete. We therefore presume that the legislature would have enacted the valid parts without the invalid parts.[106]

The parties also dispute whether the vetoed ASMI language violated the principle of separation of powers. Given our conclusion that this language must be struck because it violated the confinement clause, it is unnecessary for us to reach the separation-of-powers issue as to the ASMI appropriations.

### IV. *CONCLUSION*

As to the three ASMI appropriations, the language the governor struck was not subject to a valid exercise of the item veto power. Nonetheless, the disputed language must be struck from these appropriations because its inclusion violated the confinement clause. We therefore agree with the result the superior court reached with respect to these appropriations.

As to the new community residential centers (CRC) appropriation, we hold that including the disputed language did not violate the confinement clause. We also conclude that the governor's statement of objections was constitutionally sufficient. Ordinarily these two conclusions would require a remand to the superior court to resolve the issue which the court left undecided as to this appropriation, namely, whether the disputed language was an item subject to an item veto. But because we have indicated based on the briefing in this case relating to the other appropriations that the disputed language was not an item subject to line-item veto, and because this issue is moot, it is sufficient merely to VACATE the judgment of the superior court insofar as it relates to the CRC appropriation.

As to the Valdez therapeutic treatment program appropriation, we hold that the disputed language was not subject to the item veto and that including the disputed language did not violate the confinement clause. We therefore REVERSE the result reached by the superior court with respect to this appropriation.

BRYNER, Justice, with whom CARPENETI, Justice, joins, dissenting in part.

CARPENETI, Justice, dissenting in part.

BRYNER, Justice, with whom CARPENETI, Justice, joins, dissenting in part.

I join in all parts of the opinion except its conclusion that the confinement clause al-

---

**106.** *See Sonneman v. Hickel*, 836 P.2d 936, 941 (Alaska 1992); *see also* AS 01.10.030 (creating

weak presumption in favor of severability).

lowed the legislature to include language in the Valdez Therapeutic Treatment Program appropriation that was merely descriptive. I would hold that the disputed language violates the confinement clause, even though it is merely descriptive. Because this language is wholly superfluous, it violates *Hammond*'s necessity factor; as a superfluous and ineffectual appendage, its presence necessarily prevented the appropriation measure from being confined to an appropriation. Nor should this descriptive appendage be excused on the ground that it is "apparently without legal effect."[1] Its presence is almost as damaging as if it were binding. The governor and other executive branch officials have no way of knowing whether gratuitous language like this is mandatory or descriptive. They must choose between guessing that the language means nothing, at the risk of being wrong, or challenging the language in court to find out what it means. Either way, the language creates a problem by constraining executive branch action. By holding that the legislature is free to include superfluous descriptions in appropriation measures without violating the confinement clause, the court's opinion allows it to do so routinely in the hope that the executive branch will mistake the language as directory and follow it.

CARPENETI, Justice, dissenting in part.

I agree with all parts of the court's opinion except two dealing with the confinement clause. Under the same test that the court applies to conclude that the ASMI appropriations violated the confinement clause, I believe that the struck language in the appropriations for both the Valdez Therapeutic Treatment Program and Community Residential Center also violated the confinement clause. I join Justice Bryner's dissent concerning the former. As he persuasively shows, even merely descriptive language can cause mischief in the balance of powers between the legislature and the executive.

1. Op. at 383.

1. AS 33.30.031 provides in relevant part:
 (a) The commissioner shall determine the availability of state correctional facilities.... If the commissioner determines that suitable state correctional facilities are not available,

In my view, the struck language concerning the CRC appropriation is at least equally objectionable: In limiting the expenditures to facilities "not owned or controlled by municipalities," the legislature prevented the department from using this appropriation to contract with municipalities to provide CRC space. This language substantively changed the existing law that allowed the commissioner to contract with municipalities.[1] The struck language therefore inappropriately interfered with the discretion previously granted to the executive branch by substantive law.

The court says there is no confinement clause violation because, while AS 33.30.031 authorizes the commissioner to contract with municipalities, "it does not *require* the commissioner to put municipalities on footing equal with private enterprise as potential providers of new CRC bed space." (Op. at 382, emphasis in original.) With respect, I do not believe that is the issue. The issue is whether the language amends existing law, and I believe it does: For purposes of this appropriation only, it repeals AS 33.30.031(e), which otherwise gives the commissioner the power to contract with municipalities. The language purports to take away from the commissioner a power she clearly enjoys under AS 33.30.031(e). Thus, it violates the confinement clause. I would affirm the superior court's holding to that effect.

APPENDIX A

The appropriations at issue are as follows with the vetoed language struck out:

A. *ASMI Appropriations*

1. *Chapter 98, Section 6, SLA 1997* (as amended)

~~Contingent on the Alaska Seafood Marketing Institute having no employees who are located outside Alaska whose~~ the commissioner may enter into an agreement with a public or private agency to provide necessary facilities....

....

(e) The commissioner may enter into an agreement with ... a municipality of this state ... to provide a correctional facility....

~~positions are classified at more than Range 21 on the state salary schedule under AS 39.27.011,~~ an amount equal to the unexpended and unobligated balance on June 30, 1997, of the fiscal year 1997 general fund receipts from the salmon marketing tax (AS 43.76.110), from the seafood marketing assessment (AS 16.51.120), and from the fishery resource landing tax (AS 43.77.011) is appropriated from the general fund to the Alaska Seafood Marketing Institute for marketing Alaska seafood products during fiscal year 1998.

2. *Chapter 100, Section 70, SLA 1997*

~~Contingent on the Alaska Seafood Marketing Institute having no employees who are located outside Alaska whose positions are classified at more than Range 21 on the state salary schedule under AS 39.27.011,~~ an amount equal to the unexpended and unobligated balance on June 30, 1997, of the fiscal year 1997 general fund receipts from the salmon marketing tax (AS 43.76.110) and from the seafood marketing assessment (AS 16.51.120) is appropriated from the general fund to the Alaska Seafood Marketing Institute for marketing Alaska seafood products during fiscal year 1998.

3. *Chapter 100, Section 47, SLA 1997*

~~Contingent on the Alaska Seafood Marketing Institute having no employees who are located outside Alaska whose positions are classified at more than Range 21 on the state salary schedule under AS 39.27.011, and~~ subject to the conditions set out in (b)-(d) of this section, the appropriation made by section 31, ch. 117, SLA 1996, page 58, lines 8–11, lapses into the general fund on June 30, 2000.

B. *CRC Appropriation*

*Chapter 98, Section 39, SLA 1997*

As one of the appropriations for the Department of Corrections, $310,000 was appropriated for "new community residential centers." The vetoed language at issue in this appeal immediately followed this appropriation:

> ~~This appropriation is for new CRC beds, not owned or controlled by municipalities, to provide space in institutions for violent felons. All beds will meet department standards for Community Residential Centers. Contracts will be competitively bid.~~

C. *Valdez Therapeutic Treatment Program Appropriation*

*Chapter 100, Section 74(a) SLA 1997*

The sum of $400,000 is appropriated from the federal receipts crime funds to the Department of Corrections for a therapeutic treatment community program of up to 100 beds in Valdez ~~where cost per inmate day (exclusive of treatment costs) will not exceed the statewide average cost per inmate day for correctional institutions.~~